Assignment of Error
The defendant challenges the sufficiency of the evidence based on the absence of any physical evidence linking him to the crime, the failure of the State to negate any reasonable probability of misidentification, and the reliability of the State's witnesses.
Applicable Law
In accordance with Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), when reviewing a claim of insufficient evidence, we must determine whether the evidence viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. State v. Williams, 2011-0414, p. 16 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 769 (citation omitted).
The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence; moreover, it is not the function of this court to assess the credibility of witnesses or reweigh the evidence. State v. Richards, 2011-0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869 (citations omitted). Thus, "[a]bsent internal contradiction or irreconcilable conflict with the physical evidence, a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." State v. Rapp, 2014-0633, pp. 6-7 (La. App. 4 Cir. 2/18/15), 161 So.3d 103, 108 (citation omitted). Conflicting statements as to factual matters is a question of weight of the evidence (not sufficiency of the evidence) and, therefore, the determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State v. Jones, 537 So.2d 1244, 1249 (La. App. 4th Cir. 1989). Thus, a positive identification by only one witness is sufficient to support a conviction. State v. Neal , 2000-0674, p. 11 (La. 6/29/01), 796 So.2d 649, 658.
When, as in this case, the identity of the shooter is disputed, under *912 Jackson v. Virginia , the State must negate any reasonable probability of misidentification. State v. Stewart , 2004-2219, p. 6 (La. App. 4 Cir. 6/29/05), 909 So.2d 636, 639(citations omitted). Accordingly, the reliability of an identification is assessed under the five factors put forth in Manson v. Brathwaite , 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) : (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Id. (citation omitted).
Even where there is no physical evidence to link a perpetrator to a crime, in the absence of internal contradictions or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a conviction. Williams, 2011-0414, p. 18, 85 So.3d at 770-71 (citations omitted).
In this case, the jury returned a responsive verdict of attempted manslaughter. La. Rev. Stat. 14:31 provides in pertinent part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; ...
In turn, La. Rev. Stat. 14:27 defines attempt as:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; ...
Thus, in order to obtain a conviction for attempted manslaughter, the state must prove beyond a reasonable doubt that the defendant possessed the specific intent to kill. As defined by La. Rev. Stat. 14:10(1), specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." It can be "formed in an instant" and may be "inferred from the circumstances surrounding the offense." State v. Cooks, 2011-0342, pp. 10-11 (La. App. 4 Cir. 12/14/11), 81 So.3d 932, 939 (citations omitted). Specific intent need not be proven as fact but may be inferred from the circumstances and the actions of the accused. State v. Everett, 2011-0714, p. 14 (La. 6/13/12), 96 So.3d 605, 619. "A defendant's act of aiming a lethal weapon and discharging it in the direction of his victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." State v. Hoffman , 98-3118, p. 48 (La. 4/11/00), 768 So.2d 542, 585.
Relevant Evidence Adduced at Trial
Officer Nicole Jones, a New Orleans Police Department (NOPD) communications officer, identified State's Exhibit 8 as the recording of the 911 call made by Ms. *913 Moffett on July 13, 2016, reporting the shooting and stating that her son, Will Moffett, an alcoholic with mental problems, had just shot a man in the 800 block of Austerlitz Street.
Jim Huey, the Orleans Parish Sheriff's Department custodian of records of inmate telephone calls, identified State Exhibit 4, a call between the defendant and an unknown family member wherein the defendant denied any involvement in the shooting and stated that his mother's testimony is the only evidence implicating him in the shooting.
Ms. Moffett, the defendant's mother, testified that on February 13, 2016, the defendant had just returned to live with her at 813 Austerlitz Street after having been previously put out of her house because of his drinking. She related that she had been romantically involved with the victim but the relationship ended in September 2015, when Mr. Slan moved from the neighborhood. They remained friends, however, and on the evening of February 13, 2016, he stopped by her home to show her his truck. While they were talking, the defendant approached, told her to move and then pushed her aside. As she fell backwards, she heard a gunshot but could not see the shooter's face because it was dark. When she saw that Mr. Slan had been shot, she called 911. Ms. Moffett could not remember anything that happened after the shooting. Although she recognized her voice on the 911 call played for the jury, she said she could not remember placing the call or what she said. Nor could she remember being interviewed by a detective the night of the shooting. Under cross-examination, Ms. Moffett denied seeing the shooting or the defendant with a gun that night.
NOPD Officer Randolph Daniel testified that after being dispatched to the shooting on Austerlitz Street to assist the investigation and secure the crime scene, he was sent to University Hospital to assess the victim's condition and speak with him if possible. Officer Daniel was wearing his police issued body camera, which recorded the events at the hospital. Once at the hospital, Officer Daniel learned the victim was in critical condition with seven gunshot wounds. Initially, the victim could not speak to Officer Daniel but subsequently told him that "Will" shot him. Mr. Slan related that he was speaking to Ms. Moffett when her son walked up, mumbled something to him, and then shot him. Officer Daniel identified State's Exhibit 9 as the body camera recording of his interview of the victim at University Hospital the night of the shooting.
Detective Michael Poluikis testified that when he arrived at the shooting scene, he found Mr. Slan unresponsive on the ground with bloody clothing and a spent bullet next to him. Detective Poluikis identified the crime scene photographs, including pictures of .38 caliber ammunition casings. Detective Poluikis related that he learned from Ms. Moffett that she was speaking to a friend in front of her house when her son, who had been sitting on the porch, walked over to the victim, mumbled something, shoved her aside and then shot the victim. The detective noted that the lighting was good in the area and that Ms. Moffett gave him the defendant's name, date of birth and identified him as the shooter. Detective Poluikis related that about thirty minutes after the shooting, the defendant returned to the scene where he was handcuffed and arrested. The defendant protested his innocence and requested that his hands be tested for gunshot residue. The testing proved negative. As Detective Poluikis did not have a body camera on at the scene, he employed the use of another officer's body camera to record his (Poluikis') actions at the scene.
*914 Detective Poluikis, while wearing a body camera, spoke to the victim at the hospital late on the night of the shooting and, at that time, Mr. Slan identified the defendant as the shooter. In addition, the detective testified the victim identified the defendant on the night of the shooting from a single confirmation photograph.
Mr. Slan, the victim, testified that the defendant shot him seven times. He knew the defendant through his mother, Ms. Moffett, with whom the victim had previously been involved. Mr. Slan insisted he had a good relationship with the defendant although he let the defendant know he did not appreciate the way the defendant spoke to his own mother. Mr. Slan denied ever threatening the defendant. Mr. Slan recalled that on the evening of the shooting, he was in his old neighborhood visiting with a friend when Ms. Moffett approached and they began to converse about his truck. A few moments later, the defendant walked past them and sat on his mother's front porch. After a few minutes, the defendant went inside the house briefly and then returned to sitting on the porch. As Mr. Slan was concluding his conversation with Ms. Moffett, the defendant walked off porch and across the street. The next thing Mr. Slan knew, the defendant walked up with his hand behind his back, stood about six feet from the victim and asked him: "Now what that was you told me?" The defendant then accused Mr. Slan of having told him to keep away from the area. Mr. Slan denied the accusation and the defendant shoved his mother aside, came up with a gun, and shot the victim. The defendant ran. Mr. Slan remembered the police arriving and being transported to the hospital. He also recalled speaking with a detective while at the hospital and identifying a picture of the defendant as the man who shot him earlier in the evening.
The defendant testified, denying that he shot Mr. Slan. The defendant asserted that his only relationship with Mr. Slan consisted of seeing one another in the neighborhood and Mr. Slan dating his mother. The defendant denied ever threatening or attacking the victim. According to the defendant, he was sitting on his mother's porch the night of the shooting incident when Mr. Slan drove up in his truck. The defendant called to his mother, who came outside and spoke with Mr. Slan. As his mother and Mr. Slan were speaking, the defendant saw a suspicious car in the neighborhood. The car rounded the corner onto Austerlitz Street and stopped. A man in a hooded sweatshirt jumped from the car and ran toward the defendant's mother's house. The defendant exited the porch to the sidewalk. The man in the hooded sweatshirt ran up saying something about a quarter. The defendant called to his mother to watch out and then pushed her aside. At the sound of gunshots, the defendant had a flashback to when he was shot nine times by an AK-47 and ran from the scene to a friend's house. Shortly after the shooting, a neighbor called and told him the police were looking for him, so he returned to the scene. He was informed after he was arrested that his mother had identified him as the shooter.
Discussion
Viewing the evidence in this case in the light most favorable to the State, it was not unreasonable for the jury conclude that the defendant shot the victim with the specific intent to kill or to inflict great bodily harm on him. Moreover, the victim identified the defendant as the shooter shortly after the incident in the hospital where he was receiving medical treatment for seven gunshot wounds. The victim testified the defendant was no more than seven to nine feet away when he fired the *915 seven shots and that he knew the defendant through his romantic relationship with the defendant's mother and had, thus, conversed and socialized with the defendant on previous occasions, thereby satisfying the Manson v. Brathwaite, supra, criteria. The defendant's mother, Ms. Moffett, initially identified the defendant as the person who shot the victim, going so far as to pronounce and spell the defendant's name for the 911 operator. Detective Poluikis' body camera footage shows that the victim identified the defendant at the hospital on the night of the shooting without any prompting from the police when Detective Poluikis spoke to him in the emergency room immediately after the shooting. In addition, although the incident occurred in the early evening, both the victim and Detective Poluikis noted that it was not dark enough to obscure vision of the shooter or the scene.
It is axiomatic that credibility assessments are within the province of the jury which has great discretion in deciding whether to believe or reject a witness's testimony. Based upon evidence presented to the jury in this case, we do not find that the jury abused its discretion in accepting the testimony of the State's witnesses and, accordingly, this assignment of error is without merit.
Conclusion
The defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.