| STATE OF LOUISIANA | * | NO. 2021-KA-0254 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| NATHANIEL O. ROBINSON | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 537-889, SECTION "DIVISION D"
Judge Kimya M. Holmes,
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*
(Court composed of Judge Daniel L. Dysart, Judge Joy Cossich Lobrano, Judge Dale N. Atkins)


**LOBRANO, J., CONCURS IN IN THE RESULT**

Jason Rogers Williams, District Attorney
G. Benjamin Cohen, Chief of Appeals
Brad Scott, Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Meghan Harwell Bitoun
LOUISIANA APPELLATE PROJECT
P.O. Box 4252
New Orleans, LA 70178-4252

      COUNSEL FOR DEFENDANT/APPELLANT

**REMANDED WITH INSTRUCTIONS**
**February 18, 2022**

This is a criminal case. Defendant, Nathaniel Robinson, appeals his convictions and sentences for seventeen counts of video voyeurism, seventeen counts of attempted indecent behavior with a juvenile, and one count of indecent behavior with a juvenile. For the following reasons, we remand this matter to the district court for further proceedings consistent with this opinion.

## STATEMENT OF CASE

### I. *FACTUAL BACKGROUND*

In November 2016, R.L.[1] was sixteen years old. At that time, she lived in Algiers, Louisiana, with her mother, Mia Robinson (hereinafter "Mrs. Robinson"); her stepfather, Nathaniel Robinson (hereinafter "Defendant"); her stepsister; and her two half-brothers. The family lived in a three-bedroom house, and R.L. shared one of the bedrooms with her siblings. The house had one bathroom.

One day, in November 2016, R.L. logged onto the family computer to use it for schoolwork. While logged onto the computer, R.L. discovered several nude videos of herself saved in a file labeled "RL" on the computer. Thereafter, she told

---

[1] To protect the privacy of the victim, R.L., who was only sixteen years old at the time of the subject events, this Opinion will identify her by her initials only. *See* La. R.S. 46:1844(W)(1)(a).

1

her mother about the videos and showed them to her mother. The next day, Mrs. Robinson called the New Orleans Police Department (hereinafter "NOPD") to report the videos. During the course of the ensuing investigation, NOPD discovered seventeen videos in total. Fifteen of the videos showed R.L. in the bathroom of the family home, and she was either half-nude or fully nude while entering and exiting the shower. One of the videos depicted Defendant and R.L. in another room in the family home while R.L. wore a T-shirt and her pants were pulled down. The last video showed Defendant and Mrs. Robinson having intercourse. Defendant admitted to recording the videos.

## II. *BILL OF INFORMATION AND ARRAIGNMENT*

The State of Louisiana (hereinafter "the State") initiated criminal proceedings against Defendant in October 2017. Specifically, on October 16, 2017, the State charged Defendant by bill of information with seventeen counts of video voyeurism, which constitutes a violation of La. R.S. 14:283; seventeen counts of indecent behavior with a juvenile, which constitutes a violation of La. R.S. 14:81(H)(1); and seventeen counts of pornography involving juveniles, which constitutes a violation of La. R.S. 14:81.1. On October 18, 2017, Defendant appeared for arraignment, and the State stipulated that there was no probable cause as to the seventeen counts of pornography involving juveniles; so these charges were dropped. Defendant entered pleas of not guilty as to the remaining charges of video voyeurism and indecent behavior with a juvenile.

## III. *VERDICT*

On August 7, 2019, a jury returned a verdict of guilty as charged as to counts 1-17, video voyeurism. As to counts 18-33, indecent behavior with a juvenile, the jury found Defendant guilty of attempted indecent behavior with a juvenile,

2

violations of La. R.S. 14(27):81. As to count 34, the jury found Defendant guilty as charged of indecent behavior with a juvenile.

## IV. *MOTION FOR NEW TRIAL AND SENTENCING*

On September 13, 2019, Defendant filed a Motion for New Trial, which the district court denied that same day. Also on the same day, the district court conducted Defendant's sentencing hearing. The district court asked whether defendant was ready for sentencing, to which counsel for Defendant replied "Yes, sir." R.L. elected not to give an oral victim impact statement at the sentencing hearing; however, a written victim impact statement was read into the record. Defendant also provided a statement.

Following Defendant's statement, the district court filed into the record a memorandum in which the court addressed the sentencing guideline requirements contained in La. C.Cr.P. art. 894.1(A) and subsequently sentenced Defendant to a total of fifteen years with the sentences on certain counts running consecutive to some counts and concurrent with other counts.[2] Specifically, the district court imposed the following sentences: counts 1, 2, 3, 18, 19, and 20 were ordered to run concurrent with each other at two years each; counts 4, 5, 6, 7, 21, 22, 23, and 24 were ordered to run concurrent with each other at two years each; counts 8, 9, 10, 25, 26 and 27 were ordered to run concurrent with each other at two years each; counts 11, 12, 13, 28, 29, and 30 were ordered to run concurrent with each other at two years each; counts 14, 15, 16, 31, 32, and 33 were ordered to run concurrent with each other at two years each; and counts 17 and 34 were ordered to run

---

[2] The trial court apportioned the sentence in relation to the differing videos that were recorded. Each incident in the bathroom was recorded in three separate video scenes. These sentences were ordered to run concurrently. The counts as to the individual incidents were ordered to run consecutively.

concurrent with each other at three years and five years, respectively. Each set of concurrent sentences was ordered to run consecutively to every other set of sentences. Also, on September 13, 2019, the district court denied defendant's Motion for New Trial.

## V. *MOTION FOR OUT-OF-TIME APPEAL*

On June 9, 2020, Defendant filed a Motion for Out-of-Time Appeal, which the district court granted. This appeal follows.

## VI. *POLLING SLIPS*

While instructing the jury in this case, the district court advised the jurors that ten out of twelve of them must agree to the verdict. When the jury returned with a verdict, the district court asked the jury if there were at least ten jurors who agreed with the verdict, and the jury foreperson responded affirmatively. The record indicates that the jury issued its verdict but that the district court did not follow up with a jury count.

On July 26, 2021, this Court issued an order to the district court to produce the jury polling slips, or in lieu of locating the polling slips, to provide a certificate detailing the steps made to locate the slips, including any information discovered as to the number of jurors voting to convict Defendant. In response, on August 9, 2021, the district court[3] filed with this Court correspondence and a copy of an order dated July 28, 2021, in which the district court ordered the Clerk of Criminal District Court (hereinafter "Clerk of Criminal Court") to unseal the polling slips, if any exist, and to provide them to this Court. In its correspondence, the district

---

[3] The Honorable Kimya M. Holmes currently serves as the judge in Division D at Criminal District Court for the Parish of Orleans; however, the Honorable Paul A. Bonin (ret.) served as the judge in Division D at the time of the subject proceedings and presided over Defendant's trial.

4

court explained that, as of August 6, 2021, it had not yet received the record for inspection. Further, the district court stated that "[t]he minutes of trial do not reflect polling was conducted."

On August 13, 2021, this Court ordered the Clerk of Criminal Court to file the polling slips in the Clerk's Office of this Court. In lieu of locating the polling slips, the Clerk of Criminal Court was ordered to file a certificate with this Court detailing the steps taken to locate the polling slips. In response, this Court received correspondence from the Clerk of Criminal Court, which stated that "[f]ollowing a thorough inspection of the Clerk's Office it was determined that no jury polling slips were found in the record. Additionally, no jury polling slips were ever placed under seal concerning the referenced matter."

**TRIAL**

The matter proceeded to a jury trial, which began on August 6, 2019. The State presented three witnesses, namely Detective Nijel Baddoo (hereinafter "Detective Baddoo"), Kate Homan (hereinafter "Ms. Homan"), and R.L., the victim. Counsel for Defendant presented Detective Baddoo, Mrs. Robinson, and Defendant as witnesses.

**I. *STATE'S CASE IN CHIEF***

**A. *Testimony of Detective Baddoo***

First, the State called Detective Baddoo as a witness. Detective Baddoo testified that in November 2016, he was assigned to NOPD's Child Abuse Unit. He stated that in November 2016, he received an assignment to investigate alleged crimes involving videos of a sixteen year old female. Detective Baddoo explained that during his investigation, he interviewed the victim's mother, Mrs. Robinson, and later observed an interview with the victim, R.L., at the Children's Advocacy

Center (hereinafter "CAC"). He testified that Mrs. Robinson informed him that her sixteen-year-old daughter had located some nude videos of herself on the family computer, which was located in the living room of their home.

Detective Baddoo testified that he subsequently obtained a search warrant to seize the family computer and hard drive, as well as a second warrant to search the hard drive of the seized computer. He explained that while in the home executing the warrants, he saw several cameras in plain view, specifically the cameras were black, mounted on the wall, and located in the living room, kitchen, and children's bedroom. Detective Baddoo noted that, while at the home, he also took photographs, including of the visible cameras and the family computer. After he identified these photographs, the district court admitted them as State's Exhibit 1. Detective Baddoo stated that, despite searching, he could not locate a camera in the bathroom and that NOPD never retrieved a camera from the bathroom. He explained that NOPD did determine that there had at some point been a camera in the bathroom and that it was on a towel rack based on the vantage point in the videos of R.L. Detective Baddoo testified that, during the course of his investigation, Defendant informed him that the camera in the bathroom was the size of a clothing button.

Detective Baddoo further testified that NOPD's Forensic Department examined the computer hard drive and located video files in a folder labeled "RL." He explained that NOPD discovered a total of seventeen videos.

State's Exhibits 3A-3H were identified by Detective Baddoo as videos of R.L. nude taken from inside the family bathroom. Detective Baddoo testified that Exhibits 3A, B, and C were taken from an angle that did not show R.L. below the waist but that in the other videos the camera angle pointed downward and

6

encompassed a wider vantage point thus showing R.L.'s entire body. He stated that these videos depict R.L. nude in the bathroom while she is getting into and out of the shower. State's Exhibits 4A-E were identified by Detective Baddoo as additional videos taken inside the family bathroom that depict R.L. nude. Detective Baddoo identified State's Exhibit 4F as a video of Defendant and Mrs. Robinson engaging in sexual intercourse, and he testified that this video was located on the same hard drive as the other videos. The State then played Exhibits 4G-I, which are additional videos of R.L. nude in the family bathroom. Detective Baddoo stated that NOPD did not find any videos on the hard drive showing any of the other family members nude in the bathroom. He explained that NOPD's Forensics Department would have turned over to him any other photos, videos, or documents of a "lewd and lascivious nature" that it uncovered from the hard drive.

Detective Baddoo also testified that another video was found on the hard drive, which he identified as the "spanking" video though he explained that R.L. was not actually spanked in the video.[4] The State offered this video (hereinafter "T-shirt video") as Exhibit 4J, and Detective Baddoo testified while the T-shirt video played. The T-shirt video depicted the rear torso and buttocks of R.L., who is clad in a T-shirt that covers the top half of her bare buttocks. Additionally, the T-shirt video showed a hand that is not R.L.'s raising her T-shirt to more fully expose her buttocks, thus revealing that R.L. is wearing a thong undergarment. Detective Baddoo identified the hand in the T-shirt video as Defendant's hand and explained that he learned this when R.L. was interviewed at CAC. Detective Baddoo further

---

[4] Additionally, a review of the video reveals that the video does not demonstrate any spanking.

7

testified that a scarf seen in the T-shirt video had been placed across R.L.'s eyes as a blindfold. During the T-shirt video, the camera zoomed in on R.L.'s buttocks.

Detective Baddoo testified that he interviewed Defendant via the telephone. Detective Baddoo stated he learned from Defendant that Defendant recorded the videos because R.L. "was making a lot of noise in the bathroom" and that he did not believe she was actually taking showers while in the bathroom. However, Detective Baddoo testified that none of the videos depict R.L. "playing around" or "not doing what she was supposed to do" while in the bathroom. He stated that Defendant claimed that he similarly recorded his other daughter too, but Detective Baddoo testified that no such videos were located on the hard drive.

On cross-examination, Detective Baddoo testified that "because of the videos of [R.L.] nude, the whole situation with her being blindfolded, led [him] to believe that the videos in total [were] for [Defendant's] self, for his sexual gratification." Detective Baddoo further stated that during his phone conversation with Defendant, Defendant was "truthful" about being the person who put the camera in the bathroom; transferring the files to the computer; and knowing that R.L. was nude in the videos. He also explained that during her interview at CAC, R.L. never stated that Defendant looked at her in a sexual way, said anything unsuitable to her, or touched her in an inappropriate manner.

On re-direct, Detective Baddoo testified that during her CAC interview, R.L. stated that it was "routine" for her to have to pull down her pants and be blindfolded when she was disciplined but not for her to be videoed during disciplinary action. Additionally, Detective Baddoo explained that during his phone interview with Defendant, Defendant stated that he knew R.L. was nude on the videos because he had watched the videos.

8

**B. *Testimony of Ms. Homan***

Next, the State called Ms. Homan as a witness. Ms. Homan testified that in November 2016, she worked as a forensic interviewer at CAC, which she described as "a place where kids and their caregivers come, after there has been an outcry of abuse, whether [they are] a victim or a witness to it, and [it is] a child-friendly-like, home-like setting." Ms. Homan testified that in her capacity as a forensic interviewer she converses with children between the ages of two and sixteen by asking open-ended, non-leading, and developmentally appropriate questions when there have been allegations of abuse committed against the children.

Ms. Homan testified that she interviewed R.L. at CAC on November 17, 2016. The State then played the video recording from that interview during Ms. Homan's testimony and introduced the video into evidence. She confirmed that the video recording of the interview encompassed her entire interview with R.L. During the interview, R.L. explained that the T-shirt video was recorded in the main bedroom of the home and that the scarf seen in the video was used as a blindfold. R.L. told Ms. Homan that she and Defendant were alone in the bedroom with the door closed. Further, R.L. told Ms. Homan that Defendant pulled up her shirt and pulled down her pants, which typically happened before she was spanked though Defendant did not actually spank her on this occasion. Ms. Homan asked R.L. whether there had been anything else that made her feel unsafe or unhealthy at home, to which R.L. responded no. Additionally, R.L. reported to Ms. Homan that all the videos she discovered on the computer were of her only, except the T-shirt video in which Defendant appeared too.

9

On cross-examination, counsel for Defendant asked Ms. Homan about the process of using open-ended questions in the CAC interviews, and she explained that the use of open-ended questions is aimed at "[g]etting the child to tell me in her own words her perception of events." Counsel for Defendant also asked Ms. Homan, "[a]t no point, did [R.L.] detail any type of physical abuse or any sexual touching or sexual assault, right?" Ms. Homan responded, "I would defer to [R.L.]'s statement on the video for that." Ms. Homan testified that during the interview, referring to the T-shirt video, R.L. reported that she "inferred" Defendant was about to whip her when he pulled up her shirt. Ms. Homan also stated that R.L. reported that she opened all of the videos on the computer in the "RL" file. Further, counsel for Defendant asked Ms. Homan how R.L. responded when asked whether she felt threatened by Defendant, to which Ms. Homan testified that R.L. answered no.

## C. *Testimony of R.L.*

Last, the State called R.L. as a witness. R.L. testified that she was nineteen years old, an automated logistical specialist in the army, and working for Jefferson Parish at the time of trial. R.L. stated that in 2016, she was sixteen years old and lived in Algiers, Louisiana, with her mother, Mrs. Robinson; stepfather, Defendant; twelve year old stepsister; and two brothers, who were five and six years old. R.L. explained that their house had three bedrooms, one of which she shared with her siblings, and one "small" bathroom.

R.L. testified that her mother and stepfather were very strict when she was growing up. For example, R.L. explained that she had a cell phone but that her mother and stepfather restricted her use of it by not allowing her to have social media on it and by limiting her text messages and phone calls to friends. As

another example, R.L. stated that she was not involved in any after school activities.

Additionally, R.L. testified that there were "big," visible cameras mounted on the walls in the house, specifically in the living room, the kitchen, and the children's bedroom. She explained that the cameras were installed after the family was robbed and that everyone in the house knew of the existence of the living room, kitchen, and children's bedroom cameras. R.L. further stated that she believed additional reasons that the cameras were installed were because her stepsister "stole" food and her parents wanted to keep an eye on the children when they ran errands or went to work.

R.L. testified that she did not initially know there was a camera in the bathroom but eventually learned that there was a camera in the bathroom one day when she used the computer in the house. Regarding the computer, R.L. explained that she did not have unrestricted access to the computer; rather she had to ask her mother or Defendant to enter the password for her to access the computer. R.L. stated that, one day in November 2016, she asked her mother for permission to use the computer to find her homework. She testified that, while looking for her homework, she discovered a folder labeled "RL" and opened the folder because she thought her homework might be in that folder. R.L. explained that, instead, the folder contained videos. She stated that she opened and watched some of the videos and that "most of the videos . . . were of me . . . coming out of the shower, nude, and . . . [in] another video . . . I was in my underwear . . . . " R.L. testified that she always walked into and out of the bathroom clothed and that she always walked around the house clothed.

The State played some of the videos during R.L.'s testimony. While two of the videos played, R.L. identified herself in the videos and identified the location of the videos as the family bathroom. Further, R.L. testified that she did not know she had been videoed. She also explained that she did now know exactly where the camera was located within the bathroom but guessed that it might have been on a metal rack by the bathroom door that held the family members' personal belongings, such as toothbrushes.

R.L. testified that one of the videos she discovered of herself, i.e., the T-shirt video, was not filmed inside the bathroom. R.L. explained that, one day, her mother and Defendant wanted to know who had opened a box of cereal, and R.L. denied opening it. Despite her denial, R.L. stated that Defendant brought her into another room and "told [her] to pull [her] pants down and he blindfolded [her] and he started talking to [her], asking [her] about the cereal" and that he told her that "if [she]  lied about opening the cereal, that [she] was still going to get in trouble." The State then played the T-shirt video, and R.L. testified that it was the video she had just described. Again, R.L. identified herself in the T-shirt video and stated she was sixteen years old at the time of the T-shirt video. R.L. testified that she did not know she was being videoed and that she did not see the camera prior to or after being blindfolded. However, R.L. testified that when Defendant reprimanded her, it was normal for her to be blindfolded, to have to pull down her pants, and for Defendant to sometimes pull up her shirt. Further, she identified a hand in the video as that of Defendant; yet R.L. stated that Defendant did not actually spank her on that occasion. Rather, as R.L. explained, Defendant ultimately took the blindfold off of her and told her to go to her bedroom.

12

R.L. testified that after discovering the videos on the computer, "I was in disbelief. I sat by the computer for at least five minutes because I was in disbelief of what was going on." She explained that she initially went to her bedroom but then decided to tell her mother, who "[did not] really believe what was going on or what [she] was saying." R.L. stated that she then showed the videos to her mother, at which point Mrs. Robinson apologized and told R.L. she knew nothing about the videos. R.L. testified that after showing the videos to her mother, she went to her bedroom and cried and that her mother placed separate phone calls to one of R.L.'s aunts and to Defendant; but R.L. did not know the substance of either phone call.[5]

R.L. testified that the morning after she discovered the videos, she did not attend school: rather, her mother took her to breakfast, and they talked about the situation. In particular, R.L. stated, "I first told her . . . that I didn't want anything to happen. I just wanted to be left alone with the whole situation. I didn't want to be bothered with Nate. I didn't want to see him ever again." R.L. explained that later the same day, her mother called the police, who came to the family home and confiscated the computer. Additionally, she testified that a few days after her mother reported the videos to NOPD, she went to CAC and was interviewed there.

R.L. testified that she had not seen Defendant since she discovered the videos. She stated that she did not want to be filmed; that she did not consent to being filmed; and that "whatever was done [was not] right." Further, she explained, "[I have] learned to live with it, but it still pops up in my head that I put trust into somebody and he violated my trust."

---

[5] During cross-examination, R.L. clarified that Defendant was not home when she discovered the videos on the computer; instead he was in Atlanta, Georgia.

13

During cross-examination, R.L. testified that Defendant was the disciplinarian in the house and was the one who administered physical punishment. Additionally, R.L. explained that the bathroom had a ten-minute timer to limit the amount of time anyone was allowed in there. She stated that Defendant never touched her in a sexual manner and never said anything sexually explicit to her but agreed when counsel for Defendant asked if the videos were "kind of creepy."

## II. *DEFENDANT'S CASE IN CHIEF*

### A. *Testimony of Detective Baddoo*

Detective Baddoo testified that he did not know exactly when the videos of R.L. had been taken, but he estimated that the T-shirt video was filmed when she was fifteen years old. He explained that R.L.'s birthday was in May and the video was discovered in November. Further, Detective Badoo asserted that he believed the T-shirt video was six months old at the time it was discovered but that he did not know with certainty the age of R.L. at the time of the video. He agreed that he did not know the dates of the other videos in the "RL" file on the computer. On cross-examination by the State Detective Baddoo testified that NOPD discovered the videos when R.L. was sixteen years old though and thus a juvenile.

### B. *Testimony of Mrs. Robinson*

Next, Mrs. Robinson testified that she is R.L.'s mother and Defendant's wife. She described Defendant as "[e]xtremely tech. savvy." Mrs. Robinson explained that she and Defendant installed cameras in their home, specifically in the living room for safety after a burglary, as well as in the kitchen and in the children's bedroom to monitor the children. Additionally, Mrs. Robinson stated that she and Defendant decided that it was "best for him to discipline the children."

On cross-examination, Mrs. Robinson testified that she did not know about the camera in the bathroom and that when she initially found out about the camera when R.L. showed her the videos, she "was livid because [she was not] aware that it was in there." However, Mrs. Robinson explained that when Detective Baddoo arrived at the home to collect the videos as evidence, she "would not turn over the videos . . . because . . . [she] did not get married to get divorced." She stated that, as of the date of trial, she and Defendant remained married to each other.

Mrs. Robinson testified that, after the discovery of the videos, R.L. remained living in the house for about one or two months but eventually moved in with Mrs. Robinson's mother.

Regarding her and Defendant's disciplinary style, on cross-examination Mrs. Robinson testified that she agreed to allow Defendant to "discipline [R.L.] in a private bedroom, blindfolded, with her underwear exposed." She further stated:

> That [was not] initially how it began. It began just as a regular spanking with all of the kids until it was revealed that [R.L.] was putting on additional clothes to, I guess, alleviate the pain of getting a spanking, and it also -- she would -- I guess, like, when she would get spanked, she would fall out and roll all over, so he took those steps to keep her, I guess, more in a controlled setting, and [that is] the way he handled it for all of the kids.
>
> . . . .
>
> That was my husband's discipline style. [That is] the way the kids were disciplined.

The State then played the T-shirt video. Mrs. Robinson testified that she had never seen the video before but that what disturbed her the most is that she "was shocked [R.L.] had a thong on" in the video. However, Mrs. Robinson responded that she "did not think it was okay" when counsel for the State asked her whether "[it is] okay for your husband, a grown man, to video record your 16-year old daughter

15

from the waist down like this." Mrs. Robinson explained that their other daughter and their sons were never videoed when they were spanked; and she testified that she had no knowledge that R.L. was being recorded while being disciplined but did know that R.L. was blindfolded while disciplined. She further stated that she did not agree for R.L. to be recorded while disciplined.

Further, on cross-examination, Mrs. Robinson testified that she did not agree for there to be a camera recording in the bathroom. Mrs. Robinson explained that she did not know whether anyone other than R.L. was recorded in the bathroom. Mrs. Robinson testified about her conversation with Defendant asking him what the purpose of the bathroom camera was and she provided the following explanation:

> I believe he said that it was because he was hearing a lot of noises coming from the bathroom and he wanted to know what [R.L.] was doing[6] because she had had a habit of . . . stealing, and, so, she would steal cell phones or electronic devices that [were not] being monitored and she would use them, you know, like, in the bathroom. Like, she would turn the shower on like she was taking a shower.

> And the issue was, you know, at that time, that we only had one bathroom with six people in the house, and I had to use the bathroom, so it was a habit not to lock the door but to still be respectful of the person in it, so you had to knock.

> So I heard the shower running – and we normally hung a timer on the door -- and I knew [R.L. was] in there, so I walked in there, and she was standing on -- she [was not] in the shower. She was fully dressed, on a cell phone. And cell phones in the bathroom, that [was not] -- we [did not] allow the cell phones in the bathroom.

> . . . .

> And she -- I asked her what she was doing, and she said that, you know, she was just on the phone. And I asked her -- I took the phone from her and I told her to get in the shower and that the timer was on, because everyone else was waiting to take a shower. And I brought

---

[6] Mrs. Robinson testified that she was not at home when Defendant heard the alleged noises.

the phone to my husband, and I was like, "Can you believe she was in the bathroom with this phone," you know, "and running the shower, kind of giving the appearance that she was taking a shower?"

And he was like, "Well, what phone?" Like, "Her phone is charging right here."

And [that is] when we were made aware that she was stealing phones or using phones that [were not], I guess, had cellular service but you could still access the internet.

And then once we saw that actual phone and what she was -- she was playing, like, really inappropriate games and sending pictures to boys that were inappropriate. . . [T]hat was really like the breaking point for trusting her . . . .

However, Mrs. Robinson went on to state that "I [do not] believe that anyone should be recorded in the bathroom in their intimate moments."

On re-direct, counsel for Defendant asked Mrs. Robinson whether she would have stayed married to Defendant if she thought the video recordings were for any sexual purpose, and she responded: "No, I would not. . . . [M]y allegiance is to my marriage, but, at the same time, [I am] all about the safety of my children. . . . I did what I thought was the right thing. . . . I [was not] in the position to make a decision of whether or not it was right or wrong."

## C. *Testimony of Defendant*

Last, Defendant testified. Defendant identified his field of expertise as internet design and stated that he has extensive knowledge of internet design. Defendant explained that he was between thirty-three and thirty-five years of age when he was arrested for the crimes charged. Defendant stated that he had never been arrested prior to these charges.

Defendant testified that he initially placed two visible cameras in the house, specifically in the living room and the children's bedroom, and eventually a third visible camera in the kitchen.

17

In describing his discipline style, Defendant testified that it is "orderly" and stated, "I like to follow a system because I know systems are how [I have] been successful, so I like to incorporate that into the lives of my kids as well." In further describing his discipline regarding his daughters, Defendant testified:

> [I]t was an evolution. Kind of like, it started out as just paddling, but it evolved. And the reason it evolved was for several reasons; one, I know everyone kind of heard the blindfold, and I will go into that right now.
>
> So, as you guys heard earlier, blindfolding, for me, allows them to not be able to anticipate the swing or the hit, so, basically, if I hit their hands with a paddle or hit their arms with a paddle, [we are] talking about injury. My job is not to injure them.
>
> As it relates to the removing the bottom, as my wife pointed out, what that came from was our oldest daughter actually used to pad her pants. She would ask me – if it was time to reprimand, she would ask to go to the restroom. I would let her go to the restroom, and [she would] come back. I would reprimand her and she would leave, but what I was able to discover was she would wear additional padding. So to prevent the padding, I would have them remove their bottom to their underwear and then paddle them.
>
> . . . .
>
> The sound changed. So, initially, when a paddle hits, it makes a louder noise. When . . . when she would come from the restroom, it would be muffled, so the muffling let me know, okay, [you are] padding your pants.

Defendant explained that he always lifted his daughters' shirts to make sure the only place he was contacting was the behind.

Defendant testified that in the fall of 2016, specifically in August or September, he had concerns about R.L.'s behavior. He further explained that the reason he put the camera in the bathroom was that he could hear noises coming from the bathroom and that R.L. would stay in the bathroom longer than the fixed ten minutes allowed by Defendant and Mrs. Robinson; so he installed the camera

because he felt that was the only way "to find out [what is] going on." He stated that the bathroom camera was the size of a thumbnail.

Defendant testified about the logistics of the camera. He explained that the camera was activated by motion or sound and that the data was stored on a micro SD card. To access the stored data, Defendant further explained that he needed to remove the camera and plug it into a card reader on the computer where the data could be either deleted or moved to a different storage device. He stated that he would "scrub" the videos, which he described as "taking the play head and moving it just to ascertain who or what is on that particular video." Defendant testified that after scrubbing the videos, he transferred them to the hard drive and labeled them with the date, whether R.L. was entering the bathroom or exiting, and with R.L.'s initials. He stated that the video of him having sexual intercourse with his wife was stored in another folder. Further, Defendant explained that the bathroom camera had been in the house for about one week before his wife called to ask him about it.

Defendant testified that he refers to R.L. as his daughter and that he did not have sexual thoughts about her in placing the camera in the bathroom. He explained that he regrets the video of R.L. blindfolded and wearing a T-shirt but believed the video was necessary "to show that [he was] not being inappropriate with her in any way, shape, form, or fashion, not touching her at all." He stated that the videos of R.L. were not for sexual gratification or sexual intentions. Additionally, he noted that he never said anything inappropriate to R.L. and never touched her in a sexual manner.

On cross-examination, Defendant again testified that he installed the bathroom camera because he was trying to find out what the noises coming from

the bathroom were and that he focused the camera in the direction of the shower. The State then played some of the videos during Defendant's cross-examination; and he testified in acknowledgment that R.L. was nude in the videos and that he had watched the videos, though he stated that he watched only to scrub them to identify if R.L. was in the video and did not watch the videos in their entirety. He explained that he was merely looking for videos of R.L. stomping, jumping, and dropping things, which were sounds he heard coming from the bathroom. Defendant stated that he also had videos of his other daughter nude going in and out of the shower but that he had moved those videos into the computer's recycle bin to free up space.

Further, on cross-examination, Defendant discussed the T-shirt video, explaining that "getting to the bottom of it was the threat of a spanking by either girl to get to the truth." He testified that he lifted R.L.'s shirt because she needed to believe she was about to get spanked. He also explained that he filmed the situation because R.L. had a bare bottom and he "needed to show that [he was not] doing anything out of the ordinary or out of kilter; that [he was not] touching her in any way, shape, form, or fashion." Defendant testified that he placed that video in the "RL" file on the computer too.

On redirect, Defendant testified that he placed the videos on the same hard drive where other files were kept. He further explained that anyone on the computer would have had access to the files and that the "RL" folder was not hidden.

### ERRORS PATENT

In accordance with La. C.Cr.P. art. 920, we review all appeals for errors patent. An error patent is one "that is discoverable by a mere inspection of the

20

pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2).

Upon review of the record, we note two errors patent. First, the district court did not adhere to the twenty-four hour sentencing delay found in La. C.Cr.P. art. 873. Louisiana Code of Criminal Procedure Article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

However, if a defendant waives the twenty-four hour sentencing delay found in La. C.Cr.P. art. 873, then the district court's failure to wait at least twenty-four hours after a motion for new trial constitutes harmless error. *State v. Moffett*, 2017-0769 (La. App. 4 Cir. 6/13/18), 247 So.3d 908; *State v. Castro*, 2016-0284 (La. App. 4 Cir. 12/14/16), 206 So.3d 1059.

Defendant was convicted by jury on August 7, 2019. On September 13, 2019, Defendant filed a motion for a new trial, which the district court denied at a hearing that same day. Following the denial of the motion for a new trial, the district court asked whether Defendant was ready for sentencing, to which Defendant replied affirmatively. The district court then proceeded to sentence Defendant. When the district court sentenced Defendant on the same day as the denial of the motion for new trial, the district court failed to comply with the twenty-four hour sentencing delay found in La. C.Cr.P. art. 873; but Defendant waived the twenty-four hour sentencing delay when he stated that he was ready for sentencing following the denial of his motion for a new trial. Because Defendant

waived the twenty-four hour sentencing delay, this error is harmless. *Moffett*, 2017-0769, 247 So.3d 908; *Castro*, 2016-0284, 206 So.3d 1059.

Second, a review of the record does not demonstrate whether the jury verdicts convicting Defendant of video voyeurism, attempted indecent behavior with a juvenile, and indecent behavior with a juvenile were unanimous or non-unanimous. A non-unanimous verdict is an error patent under Louisiana law. *See, e.g., State v. Monroe*, 2020-00335 (La. 6/3/20), 296 So.3d 1062. In light of *Ramos v. Louisiana*, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), the Louisiana Supreme Court has directed appellate courts to consider non-unanimous jury verdicts as part of the appellate courts' error patent review, even if a defendant did not preserve the claim for review or abandoned the claim at some stage of the proceedings. *See Monroe*, 2020-00335, p. 1, 296 So.3d at 1062 (citing La. C.Cr.P. art. 920(2)); *see also State v. Taylor*, 2018-1039, p. 2 (La. App. 4 Cir. 6/17/20), 302 So.3d 145, 146. As discussed more fully below in conjunction with our discussion of Defendant's assignments of error, we remand this matter to the district court for further proceedings consistent with this opinion.

## DISCUSSION

### *ASSIGNMENT OF ERROR*

Defendant assigns four errors on appeal:

1. There was insufficient evidence to convict [Defendant] of these crimes, because the State's evidence did not establish "lewd or lascivious" conduct.

2. The trial court erred in permitting the State to introduce an unrelated sex tape of [Defendant] and his wife.

3. The sentence in this case is unconstitutionally excessive.

4. [Defendant]'s convictions were obtained in violation of his constitutional right to a unanimous verdict.

We discuss Defendant's assignments of error out of order due to the lack of evidence of unanimous verdicts in this case. As addressed later herein, we pretermit discussion of Defendant's second and third assignments of error also because questions remain surrounding the unanimity of the verdict.

## I. *ASSIGNMENT OF ERROR NUMBER 1: SUFFICIENCY OF EVIDENCE*

In his first assignment of error, Defendant asserts that the evidence introduced at trial is insufficient to support his convictions for video voyeurism, attempted indecent behavior with a juvenile, and indecent behavior with a juvenile. In particular, he contends that the State's evidence did not establish "lewd or lascivious" conduct on his part.

This Court has held that when an appellant argues both insufficient evidence to support a conviction and unconstitutional verdicts based on non-unanimous jury votes under *Ramos v. Louisiana*, the Court should address the appellant's insufficiency of evidence argument first. *State v. Dorsey*, 2020-0029, pp. 5-6 (La. App. 4 Cir. 12/9/20), 312 So.3d 652, 657; *State v. Hunter*, 2019-0901, p. 1 (La. App. 4 Cir. 5/27/20), ___ So.3d ___, 2020 WL 2751914, *1, n. 4. In *State v. Hearold*, the Louisiana Supreme Court explained the standard of review for a sufficiency of the evidence claim, as well as the reasoning behind discussing the sufficiency of the evidence prior to other issues raised on appeal:

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt.

603 So.2d 731, 734 (La. 1992).

We review sufficiency of the evidence prior to reviewing anything else because, if there is not sufficient evidence to support a conviction, an accused is not entitled to a new trial; rather, an accused is entitled to an acquittal. If an accused is entitled to an acquittal, then, there is no need for a new trial. *State v. Groves*, 2020-0450, p. 21 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 971 (citing *State v. Gaines*, 1996-1850, p. 4 (La. App. 4 Cir. 1/29/97), 688 So.2d 679, 682). Even if the record presents an error so prejudicial as to warrant a new trial, there can be no new trial if there is insufficient evidence. *Id.* Further, if an appellate court fails to address the sufficiency of the evidence when raised, then this constitutes error. *Id.* (citing *State v. Morris*, 615 So.2d 327, 328 (La. 1993)). Accordingly, we review Defendant's claim regarding the sufficiency of the evidence first.

**A.** *Standard of Review*

An appellate court reviews the sufficiency of evidence by determining whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that all of the elements of the offense had been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *State v. Tate*, 2001-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928. Under this standard of review, an appellate court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. *State v. Rosiere*, 488 So.2d 965, 968 (La. 1986). Further, an appellate court is neither permitted to second guess the rational credibility determinations of the fact finder at trial, nor is it to consider the rationality of the

thought processes employed by a particular fact finder in reaching a verdict. *State v. Kelly*, 2015-0484, p. 3 (La. 6/29/16), 195 So.3d 449, 451. It is not the function of an appellate court to assess credibility or reweigh the evidence. *Id.*, 2015-0484, pp. 3-4, 195 So.3d at 451 (citing *State v. Stowe*, 635 So.2d 168, 171 (La. 1994)).

Therefore, we review the record to ascertain whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of indecent behavior with a juvenile, attempted indecent behavior with a juvenile, and video voyeurism.

**B.** *Indecent Behavior with a Juvenile and Attempted Indecent Behavior with a Juvenile*

Defendant was charged with eighteen counts of indecent behavior with a juvenile. After a jury trial, Defendant was found guilty as charged of one count of indecent behavior with a juvenile and guilty of seventeen counts of attempted indecent behavior with a juvenile. Louisiana Revised Statute 14:81(A)(1) defines indecent behavior with juveniles as follows:

> A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
>
> (1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense[.]

To convict a defendant of indecent behavior with a juvenile, the State must prove three elements, namely (1) an age difference of more than two years between the defendant and the victim, who was not yet seventeen; (2) the defendant committed a lewd or lascivious act upon the person or in the presence of a child; and (3) the defendant intended to arouse or gratify either his own or the victim's sexual

desires. *State v. Dukes*, 2019-0172, p. 10 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 753 (quoting *State v. Anderson*, 2009-934, pp. 6-7 (La. App. 5 Cir. 3/23/10), 38 So.3d 953, 957-58).

Louisiana Revised Statutes 14:27 defines "attempt" as

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
>
> . . . .
>
> C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.

In order to convict a defendant of an attempt, the State must prove two elements (1) that the defendant had specific intent and (2) that the defendant committed or omitted "an act for the purpose of and tending directly toward the accomplishing of his object, sometimes referred to as an 'overt act'." *Dukes*, 2019-0172, pp. 10-11, 281 So.3d at 754 (quoting *State v. Ordodi*, 2006-0207 (La. 11/29/06), 946 So.2d 654, 661). According to La. R.S. 14:10(1), "[s]pecific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." The determination of whether specific intent exists constitutes a question of fact. *Dukes*, 2019-0172, p. 11, 281 So.3d at 754 (citing *Ordodi*, 2006-0207, p. 11, 946

26

So.2d at 661; *State v. Legrand*, 02-1462 (La. 12/3/03), 864 So.2d 89, 96). However, the State need not prove specific intent to commit the offense of indecent behavior with a juvenile as fact; rather, it may be inferred from the circumstances and actions of the defendant. *Id.* (citing *State v. Morrison*, 40,852, p. 6 (La. App. 2 Cir. 4/12/06), 927 So.2d 670, 674). Additionally, a person may be found guilty of attempt as a responsive verdict even if the evidence shows he committed the actual crime charged. *Id.*, 2019-0172, pp. 12-13 (La. App. 4 Cir. 10/2/19), 281 So.3d at 755 (citing *State v. Credeur*, 328 So.2d 59, 61 (La. 1976)).

In the context of La. R.S. 14:81, a lewd or lascivious act "has been defined as 'one which tends to excite lust and to deprave the moral with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner.'" *State v. Lane*, 2020-0181, p. 15 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 805. "Additionally, the statute's definition of a lewd and lascivious act 'encompasses not only the physical touching of the victim in an indecent manner, but also indecent sexual displays in the presence of children under the age of seventeen.'" *Id.*, 2020-0181, pp. 15-16, 310 So.3d at 805 (citing *State v. Shokr*, 2016-0337, p. 5 (La. App. 5 Cir. 2/8/17), 212 So.3d 1212, 1216). In determining whether an act is lewd or lascivious, the trier of fact must consider the time, the place, and the circumstances, including the actual or implied intention of the actor. *State v. Breedlove*, 51,055, p. 6 (La. App. 2 Cir. 1/11/17), 213 So.3d 1195, 1202 (citing *State v. Bugbee*, 34,524 (La. App. 2 Cir. 2/28/01), 781 So.2d 748; *State v. Sturdivant*, 27,680 (La. App. 2 Cir. 2/28/96), 669 So.2d 654).

In the instant matter, after viewing the evidence in the light most favorable to the State, we find that the evidence introduced at trial established each element

of the offenses for which Defendant was convicted. First, regarding Defendant's conviction of guilty as charged as to one count of indecent behavior with a juvenile, the testimony revealed that R.L. was fifteen or sixteen years old, i.e., under the age of seventeen, at the time Defendant recorded the videos of her. Additionally, the testimony revealed that there was an age difference greater than two years between R.L. and Defendant, who testified that he was between thirty-three and thirty-five years old when NOPD arrested him for the subject offenses. Second, the testimony and evidence demonstrates that Defendant's behavior was lewd or lascivious because his actions are ones that "tend[] to excite lust and to deprave the moral." Unbeknownst to R.L. and Mrs. Robinson, Defendant secretly recorded multiple videos of R.L. nude, and he admitted that he watched these videos in the process of "scrubbing" them. Moreover, Defendant saved the videos to his computer even though the videos do not demonstrate R.L. stomping, jumping, and dropping things, which were noises that Defendant claimed to have heard coming from the bathroom so as to justify his secret installation of the camera. Regarding the T-shirt video, Defendant testified that he began recording that video after observing R.L.'s bare buttocks, and during the video Defendant zoomed the camera in on R.L.'s bare buttocks. Third, any rational trier of fact could have found that Defendant had the intent to arouse or gratify his sexual desires with the videos of R.L. because all of the videos show R.L. nude and the camera zooms in on R.L.'s bare buttocks during the T-shirt video. Additionally, the testimony and evidence demonstrated that Defendant had not saved secretly recorded nude videos of any of the other family members to his computer. Further, Detective Baddoo testified that "because of the videos of [R.L.] nude, the whole situation with her being blindfolded, led [him] to believe that the videos in total

28

[were] for [Defendant's] self, for his sexual gratification." Regarding Defendant's

convictions for seventeen counts of attempted indecent behavior with a juvenile,

we have just discussed that the State presented sufficient evidence that Defendant

had the specific intent to arouse or gratify his sexual desires. Further, the testimony

and evidence demonstrate that Defendant committed an act for the purpose of

accomplishing that intent by secretly recording, watching, and saving the videos of

R.L. In sum, any rational trier of fact could have found that the State proved

beyond a reasonable doubt all of the elements of indecent behavior with a juvenile

and attempted indecent behavior with a juvenile.

## C. *Video Voyeurism*

Defendant was also convicted of seventeen counts of video voyeurism.

Louisiana Revised Statute 14:283 provides:

> A. Video voyeurism is any of the following:
>
> (1) The use of any camera, videotape, photo-optical, photo-electric, or any other image recording device, or an unmanned aircraft system equipped with any camera, videotape, photo-optical, photo-electric, or any other image recording device, for the purpose of observing, viewing, photographing, filming, or videotaping a person where that person has not consented to the specific instance of observing, viewing, photographing, filming, or videotaping and either:
>
> (a) It is for a lewd or lascivious purpose.
>
> (b) The observing, viewing, photographing, filming, or videotaping is as described in Paragraph (B)(3) of this Section and occurs in a place where an identifiable person has a reasonable expectation of privacy.

To prove that a defendant committed video voyeurism, the State must prove three

elements, namely that (1) defendant used an image-recording device for the

purpose of observing, viewing, photographing, filming, or videotaping another

person; (2) that the person did not consent to being observed, photographed, or

videotaped; and (3) that the defendant committed the act for a lewd or lascivious purpose. *Breedlove*, 51,055, p. 5, 213 So.3d at 1201 (citing *State v. Schaller*, 08-522 (La. App. 5th Cir. 5/26/09), 15 So.3d 1046, 1054).

The testimony and evidence adduced at trial was sufficient to prove the first element of video voyeurism that Defendant used a camera to film R.L. without her consent. Detective Baddoo testified that NOPD recovered videos of R.L. from the family computer; and Defendant admitted that he recorded the videos of R.L. Next, R.L. testified that she did not know that she was being filmed and that she did not consent to being filmed, and Defendant's actions were lewd or lascivious as indicated by the testimony of Detective Baddoo.

After viewing the evidence in the light most favorable to the State, we find that the State presented sufficient evidence to convict Defendant of video voyeurism. This assignment of error lacks merit.

## II. *ASSIGNMENT OF ERROR NUMBER 4: NON-UNANIMOUS VERDICTS*

In his fourth assignment of error, Defendant asserts that he is entitled to a new trial on his convictions and sentences for video voyeurism, attempted indecent behavior with a juvenile, and indecent behavior with a juvenile because the jury verdicts on these convictions were not unanimous and that, as a result, these convictions violate his constitutional due process rights under the Sixth and Fourteenth Amendments to the United States Constitution. We find that this assignment of error has merit.

At the time of Defendant's trial in August 2019, Louisiana law accepted non-unanimous jury verdicts in felony trials, and Louisiana jurisprudence upheld the constitutionality of such verdicts. *See State v. Bertrand*, 2008-2215 (La. 3/17/09), 6 So.3d 738. However, on April 20, 2020, the United States Supreme

Court rendered its decision in *Ramos v. Louisiana*. 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). In *Ramos*, the United States Supreme Court reviewed whether the federal Sixth Amendment right to trial "by an impartial jury" in criminal prosecutions calls for a unanimous jury verdict[7] and, if so, whether that requirement applies in state criminal trials via the Fourteenth Amendment.[8] *Id.* at 1394. The United States Supreme Court definitively ruled that the Sixth Amendment right to a jury trial requires a unanimous jury verdict to convict a defendant of a serious offense in a federal or state criminal prosecution.[9] *Id.* at 1395-97. Thus, per *Ramos*, a non-unanimous jury verdict in a federal or state felony trial is unconstitutional. *Id.* Further, *Ramos* invalidated the convictions of

---

[7] Of relevance, the Sixth Amendment affords to the accused in a criminal prosecution "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

[8] The Fourteenth Amendment provides, in pertinent part:

> No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[9] The *Ramos* Court explained:

> Wherever we might look to determine what the term "trial by an impartial jury trial" meant at the time of the Sixth Amendment's adoption—whether [it is] the common law, state practices in the founding era, or opinions and treatises written soon afterward—the answer is unmistakable. A jury must reach a unanimous verdict in order to convict.
>
> . . . .
>
> There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally. This Court has long explained that the Sixth Amendment right to a jury trial is "fundamental to the American scheme of justice" and incorporated against the States under the Fourteenth Amendment. This Court has long explained, too, that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government. So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court.

140 S.Ct. 1390, 1395-97 (internal footnotes omitted).

defendants by non-unanimous jury verdicts whose cases are still on direct appeal. *Id.* at 1406-08; *see also State v. Myles*, 2019-0965, p. 1 (La. App. 4 Cir. 4/29/20), 299 So.3d 643, 644; *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (providing for the retroactivity of new rules in the prosecution of criminal matters).

In the matter *sub judice*, this Court must determine whether Defendant was convicted by unanimous verdicts. Our review of the record does not show whether Defendant's convictions were unanimous. Rather, the record reveals only that Defendant was convicted by at least ten jurors. When the jury returned with a verdict, the district court asked the jury if there were at least ten jurors who agreed with the verdict, and the jury foreperson responded affirmatively. Thereafter, the jury rendered its verdict; however, our review of the record does not show whether the jury was polled and whether the verdicts were unanimous.

In *State v. Norman*, the Louisiana Supreme Court likewise faced a similar situation where the record did not reveal whether the verdict convicting the defendant was unanimous. 2020-00109, p. 1 (La. 7/2/20), 297 So.3d 738, 738-39. The majority remanded the matter to the district court "to conduct further proceedings to ascertain whether the verdict was unanimous" and "to provide a *per curiam . . .* within ten days of ruling on the *Ramos* issue and stating the outcome." *Id.*, 2020-00109, p. 1, 297 So.3d at 739.

Like in *Norman*, this Court has attempted to obtain the polling slips from the district court to determine whether the verdicts convicting Defendant were unanimous by requesting that the district court conduct proceedings to determine if the verdicts were unanimous. First, this Court issued an order to the district court to produce the jury polling slips, or in lieu of locating the polling slips, to provide a certificate detailing the steps made to locate the slips, including any information

discovered as to the number of jurors voting to convict Defendant. Thereafter, the district court ordered the Clerk of Criminal Court to unseal the polling slips, if any exist, and to provide them to this Court. Subsequently, this Court ordered the Clerk of Criminal Court to file the polling slips in the Clerk's Office of this Court. In lieu of locating the polling slips, the Clerk of Criminal Court was ordered to file a certificate with this Court detailing the steps taken to locate the polling slips. This Court ultimately received a response from the Clerk of Criminal District Court that "[f]ollowing a thorough inspection of the Clerk's Office it was determined that no jury polling slips were found in the record. Additionally, no jury polling slips were ever placed under seal concerning the referenced matter."

This Court notes that the record remains insufficient to determine whether Defendant was convicted by unanimous verdicts despite previous steps taken by this Court to obtain such information. We find *Norman* to be instructive in the instant case, and determine that a remand is necessary for clarifying the record on the crucial issue of whether the jury's verdicts were unanimous.

Because we are remanding this matter for further proceedings, we pretermit discussion of Defendant's second and third assignments of error.

## DECREE

For the foregoing reasons, we remand this matter to the district court with instructions to review the record and to conduct further proceedings to ascertain whether the verdicts were, in fact, non-unanimous. The district court shall provide a *per curiam* to this Court within ten days of ruling on the *Ramos* issue and stating the outcome of its review and proceedings.

**REMANDED WITH INSTRUCTIONS**