STATE OF LOUISIANA      *      NO. 2022-KA-0721

VERSUS      *

GERALD WEST      *      COURT OF APPEAL

     FOURTH CIRCUIT

     * 

     STATE OF LOUISIANA

     * * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 542-527, SECTION "E"
Judge Rhonda Goode-Douglas
* * * * * *
**Judge Karen K. Herman**
* * * * * *
(Court composed of Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge Karen K. Herman)

Jason R. Williams
District Attorney
Brad Scott
Assistant District Attorney
Chief of Appeals
Thomas Frederick
Assistant District Attorney
Parish of Orleans
619 South White Street
New Orleans, LA 70119

     COUNSEL FOR STATE OF LOUISIANA

Meghan Harwell Bitoun
LOUISIANA APPELLATE PROJECT
P.O. Box 4252
New Orleans, LA 70178-4252

     COUNSEL FOR DEFENDANT/APPELLANT

           **CONVICTION AND SENTENCE AFFIRMED**
           **7/05/23**

KKH
RLB
DLD Defendant, Gerald West ("Defendant"), appeals his convictions for

manslaughter, armed robbery, and obstruction of justice, and the related sentences.

For the reasons that follow, we affirm Defendant's convictions and sentences.

## PROCEDURAL HISTORY

On August 24, 2018, the State filed a bill of indictment charging Defendant

and co-defendant, Leander Lafrance ("Lafrance"), with one count of second degree

murder of Marion Huston; one count of armed robbery with a firearm; and one

count of obstruction of justice, violations of La. R.S. 14:30.1, 14:64.3, and

14:130.1, respectively.

Defendant appeared for arraignment on September 14, 2018, and entered

pleas of not guilty. The cases were severed on February 1, 2019 and on November

18, 2021, co-defendant Lafrance pled guilty to the charge of obstruction of justice,

and pled guilty to an additional charge of accessory after the fact, a violation of La.

R.S. 14:25.

On March 21, 2022, the State filed notice of its intent to introduce other

crimes evidence, to which Defendant filed an opposition on March 31, 2022.

1

The matter proceeded to jury trial and on April 8, 2022, the jury returned a unanimous verdict, finding defendant guilty of the responsive verdicts of manslaughter and armed robbery, and guilty as charged of obstruction of justice.

On August 16, 2022, the trial court imposed sentences of forty years imprisonment at hard labor on the manslaughter count; forty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, on the armed robbery count; and a concurrent sentence of twenty years imprisonment at hard labor on the count of obstruction of justice. This appeal follows.

## FACTUAL BACKGROUND

The following witnesses testified on behalf of the State: New Orleans Police Department ("NOPD") Sergeant James Kish, an officer who was dispatched to the crime scene; NOPD crime analyst Officer Charles Dionne; NOPD Crime Lab Technician Kianna Gordan, who processed the victim's vehicle; NOPD Crime Lab Forensic Firearm Examiner Sean McElrath; Maylynn Glapion, who witnessed the aftermath of the shooting; Orleans Parish Coroner's Office Chief Forensic Pathologist, Doctor Samantha Huber, who conducted the victim's autopsy; Officer Donald Blackwell, one of the first officers to arrive to the crime scene; NOPD Homicide Detective Michael Poluikis, who ultimately led the homicide investigation; NOPD Detective William Torres, an officer who responded to an aggravated assault report involving Defendant in August of 2018; Lafrance, the prior co-defendant who was present during the shooting, and Nichelle Nixon, the victim's girlfriend. No witnesses were called by the defense.

At the start of trial, prior to the presentation of witness testimony, the State played a series of 911 calls in open court. The defense stipulated to the recordings' authenticity as NOPD records kept in the ordinary course of business. The callers

2

reported that a black male had been shot but was still alive, and was lying partially outside of a white vehicle located in the rear of an apartment complex on Bundy Road, and that the shooter(s) had fled in another vehicle.[1] The record reveals that the shooting occurred outside the Lakewind East Apartments.

The State also played footage from the body-worn camera of NOPD Officer Glenn Miller ("Off. Miller"), the authenticity of which the defense also stipulated to as records kept in the ordinary course of business. The video footage depicts Off. Miller's arrival at the scene and his administration of first aid to the victim, Marion Hutson.[2] Off. Miller identified several gunshot wounds, one to the base of the victim's skull, which had exited above his eyelid, one to his upper chest, one to his lower abdomen, and another to his right arm. Officer Miller wrapped the wounds with gauze and bandages, and attempted to keep the victim conscious until EMS arrived. He also identified several forty-five caliber casings and slugs located in the driver's side of the vehicle. The victim could not identify the shooter(s), and stated that he did not know what had happened.

Sergeant James Kish ("Sgt. Kish") testified that he was dispatched to an apartment complex on 5131 Bundy Road in New Orleans East to investigate a shooting on February 3, 2018. He described the location of the apartment complex as somewhat "rural," with only sporadic residential housing nearby, and "an overgrown lot next to it." Sgt. Kish stated that when he arrived at the scene, several other officers were already present, including Off. Miller who wrapped the

---

[1] One caller reported hearing three gunshots, and another caller reported hearing one gunshot.

[2] Throughout the video, Officer Miller referred to the victim as Marcus; although the victim was conscious and able to respond to Officer Miller's questions, his speech was slurred, and Officer Miller misunderstood the victim when he identified himself.

victim's wounds with bandages. EMS had placed the victim on a gurney to transport him to the hospital.

The State introduced photographs of the crime scene *in globo*, and Sgt. Kish described each photograph as it was published to the jury. The photographs depicted the victim's vehicle from several angles, and a stream of blood leading from the driver's seat through the parking lot. Sgt. Kish pointed out a bullet hole in the driver's side door, and two bullets discovered on the ground nearby. Sgt. Kish explained that the bullets depicted in the photos were "in good condition," because they were not deformed, and they contained visible "rifling," which could potentially be used to match the bullet to a specific firearm on file in the ATF database. Sgt. Kish testified that he did not locate any surveillance video footage of the crime scene, and that the case was transferred to the homicide division later that day for further investigation.

NOPD crime analyst Officer Charles Dionne ("Off. Dionne") testified that he took several training courses on the use of GeoTime software in 2019 and 2020, which is utilized to "help [the police department] visualize cell phone records," and became a "certified GeoTime analyst" in February of 2021.[3] The trial court found Off. Dionne qualified as an expert in cellular GeoTime analysis over Defendant's objection,[4] and the State introduced Officer Dionne's digital report (in a Power Point Presentation), which he explained to the jury.

---

[3] Officer Dionne testified that he had analyzed 135 devices using the GeoTime software in 2021, including phones, vehicles, and ankle monitors, and explained, "I do spot check the data to make sure that what I see in the program is the same that is in the files I received from the carrier." He also testified that he had never been qualified as an expert in GeoTime software in court.

[4] Defendant objected "to the lack of qualification and expertise outside the company producing the product."

Off. Dionne testified that he input the location data from the cell phones belonging to defendant and Lafrance before, during, and after the shooting, as well as the time and location of the shooting, and the GeoTime software created visual timelines and maps depicting the locations of the cell phones in reference to the time and location of the shooting. According to Off. Dionne's report, Defendant's cell phone "was in the Metairie area between [1:30 pm and 1:45 pm] before moving to New Orleans at approximately 2:30 pm. The phone connected to cell sites in New Orleans East until approximately 4:00 before returning to the Metairie area." Similarly, Lafrance's phone was also in the same Metairie area as Defendant between 1:30 and 1:45 pm "before moving toward New Orleans East. The phone connected to cell sites in New Orleans East from 2:40 until approximately 3:48 pm when the phone appears to get turned off." At the time of the shooting, both phones were connected to cell towers within blocks of the crime scene, although they were not connected to the same tower. Off. Dionne accounted for the discrepancy by explaining that Defendant and Lafrance used different cell phone carriers, and because different carriers "have antennas at different locations, [] two phones from two different carriers could be in the same geographical area but connect to different cell sites." He confirmed that he had "spot-checked" the data and "no outliers" were discovered.[5]

On cross-examination, Off. Dionne confirmed that his data only provided the location of the cell tower each phone connected to during specific times, and

_____

[5] Slide number eight in the Power Point exhibit contains a video depicting the movement of the cell phones as they connected to different cell towers prior to, and at the time of, the shooting. Off. Dionne testified that it appeared that the cell phones were moving together, notwithstanding that they did not connect to the same cell phone towers at the exact same time frames. He explained that if one phone is engaged in "phone activity," (phone calls and text messages), it would appear to move faster than a phone without any activity.

5

which direction the phone was heading while it was connected. Off. Dionne conceded that his data did not indicate the identification of the person(s) in possession of the phones, and that he had not determined whether any cell towers in the area to which either phone may have alternatively connected were inoperable at the time. He also agreed that, although the cell phones appear in the visual representations to be "right next to each other," the cell sites they were each connected to "were within a mile."

NOPD Crime Lab Technician Kiana Gordon ("Gordon") testified that she processed the evidence located in the vehicle in the evidence cage at NOPD headquarters, and authenticated the photographs she had taken of the vehicle. The State introduced the photographs of the vehicle *in globo*, and Gordon described each photograph as it was published to the jury. She stated that the photograph depicted the bullet hole in the driver's side door and four spent casings, of which two were forty-five caliber, and two were nine millimeter. Two empty plastic bottles, and a box of Winchester ammunition were also discovered inside the vehicle. Gordon also identified two separate bullet holes in the interior of the vehicle in the driver's door.

On cross-examination, Gordon testified that she had not been asked to test the spent casings for either fingerprints or DNA, and she stated that the box of Winchester ammunition did not match the spent casings discovered inside the vehicle.

NOPD Crime Lab Forensic Firearm Examiner Sean McElrath ("McElrath"), whom the parties stipulated as an expert in firearm and tool mark examination, testified that he examined the forty-five caliber and nine millimeter casings as well as the projectiles discovered in the instant case. He concluded that the two forty-

6

five caliber casings had been fired from the same weapon, and the nine millimeter casings had been fired from the same nine millimeter firearm. McElrath determined that three of the four projectiles were forty-five caliber, and had been fired from the same firearm,[6] although he admitted that he was not aware of any testing that would determine whether the forty-five caliber casings and the forty-five caliber projectiles had been fired from the same firearm. One of the projectiles that had been recovered during the autopsy was determined to be a forty caliber class projectile and appeared "corroded" and "oxidized," and the coroner had apparently concluded that it had come from an "old wound." On cross-examination, McElrath conceded that his examination did not reveal the identity of the shooter(s).

Maylynn Glapion ("Glapion") testified that she was driving past the victim's vehicle on the date of the shooting, and observed one of the car doors open and someone lying half outside of the vehicle with his head on the ground. She also observed two people exit the vehicle: one from the rear driver's side, and the other had jumped over the driver's seat (from the front passenger seat) and exited the front driver's side door, and both fled "in the same direction to the right of the car." She testified further that the person who exited from the back seat had a gun. Glapion admitted that she was not asked to identify anyone in a lineup, nor would she have remembered anyone well enough to have done so.[7]

On cross-examination, Glapion explained that she was driving through the parking lot and was directly behind the victim's vehicle, which was parked in the

---

[6] Two of the forty-five caliber projectiles were recovered from the crime scene and one was recovered from the victim's body during the autopsy.

[7] Glapion testified that her child was in her vehicle with her at the time and she was afraid for her safety, so she left the crime scene immediately.

rear parking lot of the apartment complex, at the time of the shooting. She stated that she was going to see if the victim needed help, but about a minute later she saw two men exit the victim's vehicle and disappear around one of the apartment buildings. She did not see or hear any gunshots fired. Glapion testified that she backed out of the parking lot in the opposite direction from which the suspects fled and drove straight to the police station. She provided clothing descriptions of the suspects to the police, but stated that she had not seen their faces.

Orleans Parish Coroner's Office Chief Forensic Pathologist, Dr. Samantha Huber ("Dr. Huber"), testified that she conducted the autopsy of the victim on February 7, 2018, and issued a report thereon. Dr. Huber described the wounds the victim suffered, which included a gunshot to the back-left of his head, from which she removed a bullet. She testified that this fatal wound fractured the victim's skull and caused damage to his brain, resulting in "anoxic brain injury."[8] The victim also suffered a gunshot wound to his upper right arm, which exited through his armpit, then re-entered his armpit and exited again through his chest. Dr. Huber stated that the bullet in this "survivable" gunshot wound missed the victim's lungs and hit only tissue. The victim's third gunshot wound was to his lower, right back, which exited his abdomen, near his navel. Dr. Huber testified that the bullet hit the victim's large and small intestines, part of his stomach, "and some vasculature," which became infected and failed to stop bleeding, and would have also been a fatal wound. Dr. Huber testified that she also removed an older, tarnished, encapsulated bullet from the victim's back, which she estimated could be anywhere from several months to several years old. Dr. Huber testified that the

_____

[8] Dr. Huber explained that this fatal injury was the result of continued bleeding and swelling of the brain.

8

cause of the victim's death was multiple gunshot wounds, and the manner of death was a homicide. On cross-examination, Dr. Huber testified that the findings from the autopsy did not indicate who shot the victim.

NOPD Officer Donald Blackwell ("Off. Blackwell") testified that he was one of the first officers to arrive at the crime scene, and he identified himself in Off. Miller's body camera footage as the State played it again in open court. Off. Blackwell described several details in the footage as it played, notably that the victim was "slumped over…to the left side," with his head down and one foot outside of the vehicle. He also noted that the front and rear driver's side doors were open, and the rear driver's side window was down. On cross-examination, Off. Blackwell testified that he had no involvement with the investigation other than his initial response to the scene, and had no knowledge regarding the identity of the perpetrator(s).

NOPD Homicide Detective Michael Poluikis ("Det. Poluikis") testified that he became the lead detective in the instant case once the victim succumbed to his wounds and the case was transferred to the homicide division. He learned that an eyewitness had seen the perpetrators flee the scene and he presented her with a photographic lineup, although she was unable to identify either of them, as "she said she was unable to see their faces clearly." When Det. Poluikis subsequently interviewed the witness, she described both of the perpetrators as young black males, one with a lighter complexion, who had exited the rear driver's side door holding a rifle, and one with a darker complexion who had exited the front driver's side door. Detective Poluikis failed to locate any other eyewitnesses or nearby surveillance cameras.

9

Det. Poluikis testified that he swabbed several surfaces inside the vehicle for DNA, including the steering wheel, the interior car door handles, and two empty, plastic, beverage bottles. According to the Louisiana State Police Crime Lab report, the interior car door handles did not contain enough DNA to form any profiles, neither of the plastic bottles contained DNA belonging to the victim, defendant, or Lafrance, and the DNA collected from the steering wheel belonged to the victim.

Det. Poluikis testified that he learned from the victim's relative that the victim had set up a transaction to trade firearms through his Instagram account, and was provided a photograph of a rifle that was posted on the victim's Instagram page. Det. Poluikis explained that the victim had planned to trade that firearm during a proposed transaction that preceded his death. The State introduced the victim's Instagram Account records, and Det. Poluikis described them as they were shown to the jury.[9] On February 1, 2018, the victim posted a message to Lafrance stating, "For a Glizzy (Glock) or two handguns," above the photograph of the rifle. Lafrance responded, "It's a go tomorrow." The victim then asked Lafrance, "What you got?" and he replied, "The 23." Det. Poluikis explained that the number twenty-three referred to the model number of a Glock-forty caliber handgun. Lafrance then stated to the victim, "If you're trying to FWT, let me know, little brother,"[10] and then offered to purchase the rifle for a maximum of $450, or in exchange for "two Smitties (Smith & Wesson) 40s." The victim stated, "I'm good

_____

[9] Det. Poluikis identified "_seven9neno_" as the victim's Instagram username and "remanloyal_7" as Lafrance's Instagram username.

[10] Det. Poluikis explained that FWT meant to f-ck with it.

on bread…just a Glizzy or two hand poles." They apparently agreed that Lafrance would give the victim a Glock in exchange for the rifle later that day.

Det. Poluikis continued to describe the Instagram exchange between the victim and Lafrance on February 2, 2018, stating that the victim asked Lafrance "What happened?" Lafrance explained that he had fallen asleep, but that they could make the exchange at Lakewind East Apartments, where he lived, and he gave the victim his telephone number.

The State introduced Lafrance's Instagram account records and Det. Poluikis similarly described them to the jury. He noted the communications between Lafrance and Defendant in early January, and emphasized a message from Lafrance to Defendant on January 31, 2018, identifying the victim's Instagram username with a photograph of the victim's rifle attached.[11]

Detective Poluikis testified that he learned from the victim's family members that the victim and Lafrance had attended the same high school and had known each other because the victim had dated Lafrance's sister at some point. Based on the information Det. Poluikis gained from the Instagram accounts and from the victim's family, he obtained an arrest warrant for Lafrance. Once Lafrance was in custody, he agreed to an interview. Thereafter, Det. Poluikis began investigating another suspect called "Frog," and discovered "another shooting in New Orleans East where one of the—one of the subjects had the nickname of Frog." He further testified, "I then researched that incident, learned that the perpetrator—his nickname was Frog—in that incident was [Defendant]. I then began investigating and researching [Defendant]."

---

[11] Det. Poluikis identified "liffa_fg" as Defendant's Instagram username.

Det. Poluikis testified that he executed a search of Defendant's and Lafrance's phone records, and stated that there were fewer than ten phone calls between them during the month of January 2018. However, within the three days prior to the shooting, there were over forty phone calls or text messages between the two, with most originating from Defendant's phone.[12] Det. Poluikis read the text messages exchanged between Lafrance and the victim on February 3, 2018, the day of the shooting. At 12:16 pm, the victim asked Lafrance, "What you want, buy it or still [f-ck with] to trade?" Lafrance texted the victim at 1:19 pm, "My bad little brother. I just got out of the hospital and sh-t. I done f-ck around and shot myself tripping like a bih.[13] But I'm home right now or in—you can come and spin and pick that up. I ain't forget about you or you can come in the morning." Lafrance further texted the victim, "Just call me when you ready." At 3:28 pm, approximately seventeen minutes before the shooting, Lafrance texted the victim, "Park in front my brother's Jeep. I stay in the back bro, bro,"… "It's a white Jeep." Det. Poluikis also noted a text message from an unknown number to the victim's phone at 6:05 pm which stated, "Can you call me, Lee?"

The State then introduced Defendant's recorded custodial interview and played it in open court. In the footage of the recorded interview, Defendant admitted that his nickname was Frog, and that he had known Lafrance for approximately nine months. Defendant also admitted that he had learned that Lafrance had been arrested in conjunction with the instant case while he was incarcerated for an unrelated aggravated assault. However, Defendant denied that

---

[12] Det. Poluikis also testified that Lafrance called the victim four times on the day of the shooting, and the victim called Lafrance twice that day. No phone calls were placed from Defendant's phone to the victim.

[13] Det. Poluikis stated that bih meant b*itch.

he shot the victim, denied that he was at the crime scene, and claimed he did not know why Lafrance (who had given a statement to police) would have implicated him in the crime. Defendant could not explain why his cell phone was pinged in the location of the shooting on February 3, 2018, or the direct messages between Defendant and Lafrance relating to the gun trade. The recorded interview footage terminated abruptly during the interview, but Det. Poluikis testified at trial that during the interview, Defendant had also denied that he "play[ed] with guns."

On cross-examination, Det. Poluikis confirmed that of the six pieces of evidence that were swabbed for DNA, none resulted in a match for Defendant. He also confirmed that Lafrance had exited the victim's vehicle from the rear driver's side door, and was holding the rifle that was the object of the transaction. He also stated that neither of the handguns, nor the rifle, were recovered. Det. Poluikis testified that he learned Defendant had been arrested in conjunction with an unrelated incident that occurred on April 30, 2018, in which a forty-five caliber firearm was used. However, ballistic testing revealed that the forty-five caliber casings and projectiles recovered in the instant case had not been fired from the firearm used in the April 30, 2018 incident. Det. Poluikis also testified that the sole eyewitness in this case told him that the suspect who exited the front driver's door was wearing blue jeans and a maroon jacket, although Det. Poluikis did not locate those items of clothing during his investigation.

Det. Poluikis testified that prior to his assignment to the case, detectives spoke to the victim's family members, who were under the impression that the victim knew who he was meeting for the rifle exchange, but mistakenly supplied the name Jacorey rather than Leander Lafrance, although the remainder of the information provided correctly described Lafrance, including that he went to high

school with the victim, and that his sister had dated the victim.[14] The victim's family also told detectives that the victim had been shot "fairly recently in a different incident," and thought the instant shooting could be related to the earlier one; however Det. Poluikis could not recall how he excluded that theory during his investigation.

Det. Poluikis testified that the victim's girlfriend and a woman named Victoria Claiborne provided statements to detectives detailing the firearm exchange between the victim and Lafrance, and Ms. Claiborne claimed that Lafrance had admitted that he participated in the homicide. Det. Poluikis testified that Lafrance was arrested on March 1, 2018 and he agreed to an interview.

According to Det. Poluikis, Lafrance admitted that he brokered the firearm exchange with the victim on behalf of a third party named "Frog," and that they arrived at the Lakewind East Apartments in a Trailblazer to meet the victim. Det. Poluikis testified that Lafrance had placed himself in the rear driver's seat, and placed Frog next to him in the rear passenger seat, and had denied firing either of the guns used to shoot the victim. Det. Poluikis testified that Lafrance stated in his interview that he saw Frog shoot the victim first in the back of the head with one gun, and claimed that he "must have then shot him with the other gun because he was already exiting the vehicle." Lafrance also stated in his interview that he fled the crime scene in the Trailblazer, and Frog fled on foot while carrying the rifle.

Det. Poluikis testified that Lafrance claimed in that interview that he "had a problem" with Frog and had apparently intended to double-cross him at some point

---

[14] Further, the victim's girlfriend had given detectives what purported to be the phone number of "Jacorey," which was different from Lafrance's phone number by only two digits. Det. Poluikis conducted a warranted search on the records of that phone number and quickly realized it was not associated with the instant case.

in conjunction with the firearm exchange. Det. Poluikis was also aware that Lafrance had agreed to provide a subsequent statement to the District Attorney, although he could not recall the specific content of that statement. He also admitted that he had not obtained a search warrant for Defendant's residence, nor had he located the rifle or any evidence while executing a search at Lafrance's residence.

On re-direct examination, Det. Poluikis testified that he recalled learning of an interview with someone named Ms. Foley that had occurred prior to his assignment to the case, in which she alleged that she overheard her nephew, Defendant, discussing a shooting with his friend, Lee, which had similar details as the instant case. Det. Poluikis also confirmed that all of the bullets recovered from either the crime scene or the autopsy were forty-five caliber and were fired from the same weapon; he could not verify that the nine-millimeter casings also discovered in the vehicle had been fired either at the crime scene, or on the same day.

NOPD Detective William Torres ("Det. Torres") testified that in April of 2018, he responded to a report of aggravated assault. He located forty-five caliber casings at that crime scene, and the victim identified the perpetrator as Gerald West, who Det. Torres learned also went by the nickname "Frog."

Lafrance testified that he met the victim in school in 2013, and his sister and the victim began a year-long dating relationship sometime in 2014. Lafrance testified that he knew the victim "like a younger brother," and stated that "[h]e wasn't like hustling or committing crimes or nothing like that." Lafrance admitted that he had planned to meet with the victim on the day of the shooting, but claimed he could not remember why.

The State introduced Lafrance's recorded police interview and played it in open court.[15] A review of the exhibit revealed the following synopsis of Lafrance's police interview. Asked if he knew anything about the shooting that had occurred recently on Bundy Road, Lafrance admitted that his friend, who used to date his sister, had recently been shot in that area.[16] Lafrance explained that the victim was involved in the gun trade, and admitted that he had purchased a small firearm from the victim on a previous occasion. Lafrance had asked the victim to notify him if he ever had a rifle for sale, which he repeatedly referred to during the interview as a "stick." Eventually the victim contacted Lafrance and offered to trade him a rifle for another firearm.[17]

Lafrance told Det. Poluikis that he offered to buy the rifle for $400 cash, which the victim apparently declined. Lafrance then asked his friend "Frog" if he had any guns to trade for the rifle, and Frog replied that he did. Lafrance confirmed with the victim that Frog would be trading the firearm, and they arranged the meeting. Lafrance told Det. Poluikis that when the victim arrived to conduct the transaction, Lafrance and Frog both entered the back seat of the victim's vehicle. The victim and Frog greeted each other, then Frog pulled out one of the firearms he had brought to trade and shot the victim. Lafrance asked Frog, "What the f-ck?" and as he turned to exit the vehicle, he heard Frog fire more gun shots.

---

[15] Lafrance testified that he recognized himself and his voice in the recorded video footage of his police interview, but denied any recollection of the content of his statements. The state offered, and the court admitted without objection, Lafrance's recorded interview pursuant to La. C.E. 804(A)(3), which deems a declarant "unavailable as a witness" when he cannot or will not testify in court concerning the substance of his out-of-court statement when he "testifies to a lack of memory of the subject matter of his statement."

[16] Det. Poluikis told Lafrance that only one shooting had occurred on Feb. 3, 2018 on Bundy Road, and it was quickly established that the victim was Lafrance's friend.

[17] Lafrance explained to Det. Poluikis that the value of a rifle was equivalent to a Glock or two smaller handguns, like a Smith and Wesson, for example.

In response to more detailed questioning by Det. Poluikis, Lafrance explained that when he entered the victim's vehicle, he sat in the backseat behind the victim, Frog sat next to him in the rear, passenger seat, and the victim placed the rifle in the backseat. He stated that Frog had brought with him (ostensibly to trade for the rifle) a "four five" and a nine millimeter "or something."[18] Defendant was holding one of the guns in his lap and the other in his hand after he entered the vehicle. Lafrance told Det. Poluikis that Frog must have fired both guns since he heard, "two, three, or four" more gun shots, and since Det. Poluikis revealed that police had located two different caliber casings at the crime scene. Lafrance stated that when they fled, he ran to the left and drove away in his Trailblazer, and Frog grabbed the rifle and ran in the opposite direction on foot. Lafrance told Det. Poluikis that he did not know Frog's real name, but described him as eighteen, nineteen, or twenty, and provided his Instagram username. Lafrance stated that he was getting nothing from the transaction, and that the victim and Frog knew each other.[19]

After the State played Lafrance's recorded police interview for the jury, it tendered the witness.

On cross-examination, Lafrance admitted that he was initially charged with second degree murder with Defendant, but in exchange for his trial testimony, he agreed to plead guilty to obstruction of justice and accessory after the fact. He received a twenty-year sentence of imprisonment at hard labor on the obstruction

---

[18] Lafrance described the guns as "a four-five millennium and a nine millennium," however, it appears that he meant millimeter.

[19] Because Lafrance ultimately admitted that he was not needed to broker the transaction between the victim and Frog, Det. Poluikis asked Lafrance why he was there. Lafrance responded that he and the victim, who he referred to as "little brother," were going to leave together after the transaction.

charge and a five-year sentence on the accessory charge, but nevertheless agreed that his expected, actual release date was in September of 2025.

Lafrance testified that some of the statements he made in his recorded interview with Det. Poluikis were not true. He admitted that he had made a second statement to the District Attorney, in the presence of his attorney, on November 16, 2021, in which he stated that he picked up his girlfriend, Frog, and another person named Ruger in his Trailblazer and drove to the Lakewind East Apartments to meet the victim. The rest of his story remained the same, except that he indicated that he was the one who grabbed the rifle when he fled the victim's vehicle after the shooting. Lafrance admitted on cross-examination that he had learned during discovery conducted for his own trial that an eyewitness had described him as the perpetrator who had exited the vehicle holding the rifle, and that the witness reported that both perpetrators fled in the same direction. Consequently, he decided to change his story to align with what the witness had reportedly observed. Lafrance testified that he lied to Det. Poluikis about Ruger's and his girlfriend's presence at the scene because he did not want to get them involved. On re-direct examination, Lafrance admitted that Frog fled the crime scene with him (and his girlfriend and Ruger) in his Trailblazer. He also stated that he was frightened to testify against Defendant because he was concerned for his family's safety.

Nichele Nixon ("Nixon") testified that the victim was her boyfriend of several years and the father of her child. She stated that she had been aware that the victim was involved in unauthorized firearm transactions, and she knew that the victim had planned to trade his rifle for two handguns on February 3, 2018 because he had told her, and because he had posted it on his Instagram account. Nixon testified that she knew Lafrance because he was friends with the victim, and was

18

aware that the victim had dated Lafrance's sister in the past. She testified that the victim "trusted [Lafrance], and he had to trust [Lafrance] to let him in the vehicle," so she "assumed" they had had a close and lengthy relationship.

## **ERRORS PATENT**

A review of the record reveals that the trial court failed to observe the mandatory twenty-four-hour delay required between overruling Defendant's motions for a new trial and imposition of sentence pursuant to La. C.Cr.P. art. 873.

La. C.Cr.P. art. 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

Although the article provides that sentencing may be imposed immediately following the trial court's denial of a new trial motion if the defendant expressly waives the delay, here, the sentencing transcript contains no indication that Defendant waived the statutory twenty-four-hour sentencing delay.

The Louisiana Supreme Court has held that a defendant's pronouncement of his readiness for sentencing may operate as an express waiver of the twenty-four-hour sentencing delay, but a defendant's mere participation in the sentencing hearing is insufficient to constitute an express waiver required by La. C.Cr.P. art. 873. *State v. Kisack*, 2016-0797, p. 7 (La. 10/18/17), 236 So.3d 1201, 1205.

In the instant case, following the State's presentation of victim impact testimony, the trial court asked Defendant, "Are you ready for sentencing?" Rather than provide a direct response, defense counsel replied, "May I be heard, Your Honor?" and proceeded to advocate for sentences far below the statutory

maximums Defendant faced for all three convictions. The trial court did not ask again before imposing the sentences whether Defendant was ready to be sentenced. Defendant neither expressly stated that he waived sentencing delays, nor did he expressly announce his readiness for sentencing. While Defendant did participate in the sentencing hearing and advocate for lighter sentences, as noted above, that is insufficient to constitute an express waiver.

Nevertheless, "an error in failing to observe the statutory sentencing delay may still be found harmless." *Kisack*, 2016-0797, p. 7 236 So.3d at 1205–06.; *see e.g. State v. White*, 404 So.2d 1202, 1204 (La. 1981) (When "there has been no objection raised regarding the sentence imposed [], and no showing or suggestion that defendant was prejudiced," the failure to observe the sentencing delay does not require a remand for resentencing); *State v. Moffett*, 2017-0769, p. 3 (La. App. 4 Cir. 6/13/18) 247 So.3d 908, 911 (error in failing to observe sentencing delay found harmless notwithstanding the absence of an express waiver where "the sentence was imposed two months after the defendant's conviction, the defense counsel provided a letter of mitigation prior to sentencing, and the sentence imposed by the trial judge was half of the maximum sentence allowed by law"). *But see Kisack*, at pp. 7–8, 236 So.3d at 1206 ("it is difficult to conclude the error is harmless" when the defendant "faced a sentencing range of 20 years to life and received the maximum sentence authorized for a fourth-felony offender for possession of a contraband cell phone"); *State v. Francis*, 2019-0227, p. 1 (La. 4/29/19), 268 So.3d 289 (failure to observe the delay is not a harmless error where defendant did not waive the delay, and challenges his sentence).

Here, over four months elapsed between Defendant's convictions and his sentencing hearing, the trial court conducted a pre-sentence investigation, and both

parties submitted pre-sentencing memoranda on the issue. Accordingly, we find that the trial court's failure to observe the twenty-four hour delay mandated by La. C.Cr.P. art. 873 is a harmless error. *See Moffett*, 2017-0769, p. 3, 247 So.3d at 911.

## DISCUSSION

*Assignment of Error Number 1*

As Defendant's first assignment of error, he asserts that the trial court erred in allowing the state to present other crimes evidence in violation of La. C.E. 404(B). Specifically, Defendant complains that the State elicited testimony from Det. Torres that Defendant committed a shooting on April 30, 2018 and that forty-five caliber casings were discovered at the crime scene. Det. Torres also testified that the victim of the subsequent shooting positively identified Defendant as the perpetrator in a confirmation photograph, and stated that his nickname was "Frog."[20]

At a pre-trial hearing on the matter, the State explained that "the detective was given the nickname of 'Frog' very early on in the investigation…he found out who 'Frog' was because of the April 30, 2018 case." The State continued, "it would be difficult to explain how the detective developed [Defendant] as a suspect simply from the nickname of 'Frog,' without talking about how is 'Frog'—how'd you find out who 'Frog' was." The trial court stated that it would allow the State to present the evidence of the April 30, 2018 shooting, finding that it "goes to

---

[20] The State noted at a pre-trial hearing that in the 2018 incident, "[D]efendant … was the passenger in a car. The car stopped and he fired from within the car at the victim on his porch, and then he fled. He used a .45 caliber handgun." Defendant admitted in his opposition to the State's notice that Defendant had pled guilty to the charge.

[Defendant's] identity," and stating "it sounds like that is how they developed [Defendant] as a suspect in this particular case."

Defendant asserts that because the forty-five caliber casings discovered at the crime scene at the April 30, 2018 incident were not fired from the same firearm as the forty-five caliber casings discovered at the crime scene in the instant case, evidence that Defendant was involved in another shooting was irrelevant and could have only served to prejudice the jury. Defendant further argues that the State did not need to present evidence of the April 30, 2018 shooting to prove Defendant's identity as "Frog," arguing that the State had proved Defendant's identity through his cell phone records and through Lafrance's testimony.

La. C.E. 404(B) provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Additionally, while irrelevant evidence is generally inadmissible, La. C.E. 402, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." La. C.E. art. 403. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401.

Evidence of other crimes is generally "not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense." *State v. Taylor*, 2016-1124, p. 12 (La. 12/1/16) 217 So.3d 283, 292. The trial court has "broad discretion in weighing the probative versus prejudicial value of evidence under La. C.E. art. 403, and its ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be disturbed absent an abuse of discretion." *State v. Randolph,* 2016-0892, p. 7 (La. App. 4 Cir. 5/3/17), 219 So.3d 425, 431 (citing State v. Coleman, 2014-0402, p. 39 (La. 2/26/16), 188 So.3d 174, 205, overruled on other grounds by *State v. Brown*, 2016-0998, p. 115 (La. 1/28/22), 347 So.3d 745, 826).

In this case, Defendant's identity as a perpetrator was a material fact at issue, as his trial defense was that he was not present at the crime scene. Det. Poluikis testified on cross-examination that Lafrance had not provided the identity of the person he repeatedly referred to as "Frog" throughout his police interview, nor did Lafrance disclose the identity of Frog during cross-examination. However, during the State's re-direct examination of Lafrance, the state asked who, in addition to Defendant (by name), was in his vehicle when he fled the crime scene after the shooting, and he responded "Ruger and my girlfriend, Kemona." The State asked who Ruger was and Lafrance replied, "A friend of Frog's." This appears to be the only time that Lafrance acknowledged that Defendant was, in fact, Frog. However, it is not clear that the State "established" Defendant's identity as Frog through that brief exchange such that it rendered the introduction of the other crimes evidence unnecessary or cumulative. During Defendant's recorded police interview, which the jury viewed at trial, he also admitted that his nickname was Frog. While this evidence does reveal Defendant's identity as Frog, it does not explain how Det.

23

Poluikis developed the identity of defendant as a suspect during the course of his investigation. The State argues in its appellee brief that the other crimes evidence showed the jury "that detectives did not merely choose a suspect to investigate out of a hat."

Additionally, while the State revealed Defendant's identity at trial through his cell phone records, they do not confirm that his nickname is Frog, and the Geo-tracking cell tower evidence only places Defendant within a mile of the crime scene. Defense counsel stressed these facts in his closing argument, stating repeatedly that no witness had identified Defendant by name as a perpetrator in the instant case, and no evidence placed him at the crime scene.

According to Det. Poluikis, he did not know the identity of "Frog" until he learned of the April 30, 2018 shooting involving a perpetrator also called Frog. Once he learned that the victim had identified Defendant by name as Frog, and positively identified him in a confirmation photograph as the shooter, Det. Poluikis then began his investigation into Defendant. Thus, it was not until Det. Poluikis learned Defendant's real identity that he was able to further investigate him, and to apply for a search warrant for Defendant's cell phone records. As such, the introduction of the April 30, 2018 shooting shows how Det. Poluikis developed Defendant as the other suspect during the course of his investigation, and is therefore relevant to prove Defendant's identity as Frog, the person with whom Lafrance allegedly co-perpetrated the instant crime.

Moreover, the fact that the April 30, 2018 incident was a shooting is relevant to rebut Defendant's defense. In Defendant's statement to police during his recorded custodial interview, he told Det. Poluikis that he did not "play with guns,"

and evidence that Defendant had been identified as the shooter in a separate case was relevant to rebut that claim.

Defendant further contends that the introduction of the evidence that forty-five caliber casings were discovered at the scene of the April 30, 2018 shooting was unfairly prejudicial, arguing that because Defendant used a forty-five caliber firearm in another shooting, the jury was likely influenced to find that he also used the forty-five caliber firearm in the instant case, notwithstanding Det. Poluikis's testimony on cross-examination that the casings found at the two crime scenes had not been fired from the same weapon.

Defendant asserts that the State emphasized in its closing argument that only forty-five caliber projectiles were discovered at the instant crime scene, and minimized the presence of the nine millimeter casings, solely to show that "if [Defendant] used a .45 in another shooting, he must have used a .45 in this shooting." However, a review of the transcript indicates that when the State noted in its closing argument that only forty-five caliber bullets had been located at the scene and the autopsy, and that no nine millimeter bullets were found, it was to undermine Lafrance's statement to Det. Poluikis that Defendant must have shot the victim using *both* of firearms he had brought with him. There is no indication in the State's closing argument that it suggested that Defendant must have been the shooter because forty-five caliber casings were discovered at both crime scenes.

The State asserts in its appellee brief that any prejudice to Defendant was minimized by its agreement with defense counsel to limit the testimony it elicited from Det. Poluikis and Det. Torres regarding the facts of the April 30, 2018 shooting. During a break from the cross-examination of Det. Poluikis, defense counsel stated on the record:

25

> Your Honor, with regards to [the State's] prior questioning on direct of Detective Poluikis, I wanted to put on the record that I specifically agreed to allow three leading questions that danced around the previously admitted 404 information and likewise for the following witness, which would be Detective Torres. [The prosecutor] and I have agreed that in the interest of efficiency, I will agree to him leading Detective Torres, also in keeping out of excluded portions of the 404, with the agreement that if I feel he goes out of bounds, obviously, I reserve my right to object at that point. [21]

Additionally, the trial court instructed the jury that the evidence of other crimes could be considered only for the purpose of Defendant's identity.

In *State v. Bibbins*, 2018-0419, p. 13 (La. App. 4 Cir. 10/24/18), 258 So.3d 134, 144, the victim was attacked by a man he only identified by the nickname "Mo," who he had seen driving a black BMW. Because the state could not clearly establish the identity of the perpetrator any other way, the trial court allowed the state to introduce evidence of a litany of other crimes the defendant perpetrated, including two shootings in which witnesses identified the defendant as "Mo," two arrests for narcotics possession, and four traffic violations committed in a black BMW. *Id.,* at pp. 11-14, 258 So.3d at 143-45. This Court held that the trial court had not "abused its discretion in allowing the other crimes and acts into evidence to establish Mr. Bibbins' identity, particularly given the trial court's limiting jury instruction," and stated that "without that other crimes evidence, there is a lack of evidence linking the person nicknamed "Mo" with Mr. Bibbins." *Id.,* at pp. 13-14, 258 So.3d at 144-45.

In *State v. Hawkins*, 2016-0458, pp. 22-23 (La. App. 4 Cir. 5/17/17), 219 So.3d 1133, 1146, this Court held that the trial court did not abuse its discretion in

---

[21] It is not clear which portions of the other crimes evidence may have been excluded. Nothing in the record indicates that the trial court excluded any portion of the evidence offered by the State.

admitting evidence of the defendant's prior conviction for accessory (to murder) after the fact in a case in which defendant was charged with, among other things, second degree murder. During the investigation, the detective received information of a possible suspect with the nickname "G-4," and subsequently learned the real identity of "G-4" from the detective who had investigated the earlier murder for which the defendant had pled guilty as an accessory. *Id.*, at p. 7, 219 So.3d at 1138. With the knowledge of the suspect's real name, the detective was able to include him in a photographic lineup shown to eyewitnesses who positively identified the defendant as a perpetrator. *Id.* This Court found that the admission of the previous conviction "was crucial in identifying [the defendant] in connection with [the victim's] murder." *Id.,* at p. 23, 219 So.3d at 1146.

Similarly, the State in this case introduced very limited evidence of a separate shooting to show how Det. Poluikis connected the nickname "Frog," to Defendant and was able to successfully proceed with his investigation. Additionally, as in *Bibbins,* the trial court provided a limiting instruction to the jury to consider the evidence only for the purpose of establishing Defendant's identity. Thus, like in *Bibbins* and in *Hawkins*, the trial court did not abuse its discretion in admitting the other crimes evidence.

In any event, even if the trial court should have excluded specific reference to the forty-five caliber casings discovered at the scene of the April 30, 2018 shooting, erroneous admission of other crimes evidence is harmless unless a reviewing court is "thoroughly convinced that the remarks inflamed the jury and contributed to the verdict." *State v. Prater*, 1999-0900, p. 7 (La. App. 4 Cir. 4/26/00) 762 So.2d 82, 88 (quoting *State v. Nicholson*, 1996-2110, p. 13 (La. App. 4 Cir. 11/26/97), 703 So.2d 173, 180).

Here, it does not appear that the jury was so inflamed that its verdict was influenced by the similarity of the caliber of the casings discovered at the two crime scenes. According to all of the text and Instagram messages introduced at trial, as well as Lafrance's statement to police, Defendant brought the two firearms to trade for the rifle because Lafrance did not have any firearms to trade. Ms. Glapion testified that she saw two men exit the victim's vehicle and flee, and the only people discussing the firearm transaction, according to the text and Instagram messages, were the victim, Lafrance, and defendant. Lastly, the cell phone tower records place Defendant's phone within one mile of the crime scene at the time of the shooting and they also show that his phone travelled together with Lafrance's phone toward the crime scene, and Lafrance's statement to police placed both himself and defendant at the crime scene. Given this evidence, the brief reference to the caliber of casings discovered at the scene of the April 30, 2018 shooting surely did not contribute to the jury's responsive verdict of manslaughter. The first assignment of error lacks merit.

***Assignment of Error Number 2***

Defendant also claims that the trial court erred in permitting the State to elicit testimony of the victim's character. The admission of testimony Defendant specifically complains of occurred during the State's direct examination of Lafrance regarding the victim's relationship with Lafrance's sister. Lafrance testified that while his sister and the victim were dating, the victim would often come over to his house, and he regarded the victim as a younger brother. The State asked Lafrance if he felt protective over his sister and he replied in the affirmative. The State then asked why Lafrance would allow the victim "to be around [his] sister," and he responded, "He was—he wasn't like dudes I know that be in the

28

street, so he was cool." The State asked what he meant by that, and Lafrance explained, "[H]e was in school. He wasn't like hustling or committing crimes or nothing like that." Defense counsel then stated, "Your Honor, I'm going to lodge an ongoing objection to relevance as this line of questioning has nothing to do with the events we are actually here for." The trial court overruled the objection, but the State nevertheless moved on to another line of questioning.

La. C.E. art. 404(A) provides: "[e]vidence of a person's character or a trait of his character, such as a moral quality, is not admissible in a civil or criminal proceeding for the purpose of proving that he acted in conformity therewith on a particular occasion."[22]

At the outset, as the State notes in its appellee brief, it is not clear that this assignment of error is preserved for review, as Defendant's objection was on the grounds of relevance, and not to the inadmissibility of character evidence.

> It is well-settled that an irregularity or error, relating to "the ruling or order of the court," cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C.Cr.P. art. 841(A); *State v. Marlowe,* [20]10–1116, p. 35 (La. App. 4 Cir. 12/22/11), 81 So.3d 944, 966. Not only must a contemporaneous objection be made, but also La. C.Cr.P. art. 841(A) requires that a defendant make "known to the court ... the grounds therefor," i.e., the grounds for his objection, and he is limited on appeal to the grounds articulated at trial. *State v. Ott*, [20]10–1307, p. 13 (La. App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287. A new basis for objection cannot be raised for the first time on appeal. *State v. Carter*, [20]10–0614, pp. 27–28 (La. 1/24/12), 84 So.3d 499, 521.

---

[22] La. C.E. 404(A)(2) provides exceptions for the admission of evidence of the character of the victim if there is also evidence of a hostile demonstration or overt act on the part of the victim at the time of the offense, or if the victim pleads self-defense and there is a history of assaultive behavior between the victim and the defendant in a domestic setting. These circumstances are not present in the instant case and thus would not apply.

*State v. Griffin,* 2015-0125, pp. 22-23 (La. App. 4 Cir. 9/16/15), 176 So.3d 561, 574–75.

Nevertheless, it is unlikely that the State elicited Lafrance's testimony for the purpose of proving that the victim acted in conformity with that character at the time of the offense, as the jury was aware that the offense occurred during an illegal firearms transaction initiated by the victim. Moreover, trial testimony revealed that the victim dated Lafrance's sister as a high school student, and that they began dating in 2013, approximately five years before the offense occurred. Thus, the evidence was not of the victim's present character, but Lafrance's opinion of the victim's character as a youth.[23]

The State argues in its appellee brief,

> [T]he purpose of the challenged testimony was to explain the background of [the victim and] Lafrance's friendship. This portion of the testimony was explaining that [the victim] previously dated Mr. Lafrance's sister, but the relationship was over and that they were still friends. Mr. Lafrance's opinion of [the victim's] character was relevant to show that the two did not have animosity toward each other, and to help the jury better understand that the friendship of the two had existed both before the relationship between [the victim] and Lafrance's sister began and after that relationship ended, and was not contingent on her in a way that might suggest that Mr. Lafrance bore a grudge against [the victim] and had a motive to harm him.

In light of the totality of the State's evidence discussed in the assignment of error above, and the uncontested evidence that the offense occurred during an

---

[23] Even in circumstances when testimony is admissible to prove that a party acted in conformity with their character, the method by which character must be introduced is governed by La. C.E. art. 405. Generally, a witness's personal opinion of a party's character or character trait is inadmissible, and character must be proved by the general reputation discussed in the community. *State v. Williams*, 1999-1581, p. 9 (La. App. 4 Cir. 6/14/00) 766 So.2d 579, 584; *see also* La. C.E. art. 405(A). However, erroneous rulings pursuant to this code article are subject to the harmless error rule. *State v. Burton*, 2019-01079, pp. 8-9 (La. 6/30/21) 320 So.3d 1117, 1123-24.

illegal firearms transaction, the jury's verdict was surely not attributable to Lafrance's brief testimony that the victim was not a criminal in his youth. Any error in the trial court allowing the testimony appears harmless, and thus this assignment is meritless.

***Assignment of Error Number 3***

Defendant next asserts that the trial court erred in permitting Dionne to testify as an expert in GeoTime software analysis. The thrust of Defendant's argument is not that Dionne was unqualified to have been deemed an expert, nor that the substance of his testimony should have been excluded. Rather, Defendant argues that his designation as an expert was simply unnecessary because he could have provided the same testimony as a lay witness. Defendant contends in his appellate brief:

> [t]he evidence which was being presented to the jury was simply cell phone data. Every person who ever had a phone call drop because they were not near a cell tower understands that a person's cell phone connects to cell phone towers in the area. And the GeoTime program was merely demonstrative of that fact evidence. This was fact evidence and did not require an expert's opinion.
>
> The jury was perfectly capable of understanding the imagery and conclusions of the GeoTime program, which simply analyzes and demonstrates cell phone data over time. There was no need for Dionne to testify as an expert, as he could have simply testified as an operator of the program.

Prior to addressing this argument, it is important to note that at trial, Defendant did not object to Dionne's designation as an expert on these grounds. Defendant objected "specifically …to the lack of qualification and expertise outside the company producing the product." Defendant does not replicate that argument in his brief to this Court. Accordingly, it is arguable that this argument is

31

not preserved for review, as Defendant is presenting a new ground for his objection for the first time on appeal. *See* La. C.Cr.P. art. 841.

Nevertheless, based on Defendant's characterization of Dionne's testimony as "fact evidence," that "the jury was perfectly capable of understanding" whether Dionne was designated an expert or not, it is difficult to see how Defendant was prejudiced solely by the trial court's designation of Dionne as an expert, as he provided no expert opinions, or any testimony specifically reserved for an expert that would have been inadmissible if testified to by a lay witness. The only prejudice Defendant alleges is that the trial court's designation of Dionne as an expert may have convinced the jury to give undue credibility to his conclusions. This argument is not persuasive.

It is well settled law that "credibility is for the factfinder. The jury is the lie detector in the courtroom." *State v. Lewis*, 1995-0209, p. 6 (La. App. 4 Cir. 4/13/95), 654 So.2d 761, 766. "Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof rather than exclusion is the appropriate means by which [an expert's] testimony may be challenged." *Id*. Moreover, if Dionne's testimony was, as Defendant suggests, simply fact evidence that consists of data points presented on a map through a software program that any juror could understand, it is not clear that Dionne presented any of his own personal conclusions to the jury that would have required a credibility determination.

Based on the above discussion, even if the trial court abused its broad discretion in finding that Dionne qualified as an expert in GeoTime software, the only prejudice defendant identifies is the possibility that the jurors found Mr. Dionne more credible than they otherwise might have, in his testimony that

Defendant contends was merely facts and data that any juror could understand. *See* La. C.Cr.P. art. 921 ("A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."). For these reasons, we do not find that Defendant's substantial rights were affected by the designation of Dionne as an expert in GeoTime software where his testimony included no expert opinions and did not prejudice Defendant.  This assignment of error lacks merits.

### *Assignment of Error Number 4*

Defendant further argues that the trial court erred in failing to grant a mistrial after a member of the defense team, Hailey Fortezzo ("Fortezzo"), alleged that she overheard a juror tell two other jurors, "He is guilty." Although the trial court ultimately determined that Fortezzo was mistaken, Defendant asserts that the jurors involved must have been affected by the accusation, and he "was prejudiced by this interruption at his trial."

During the State's direct examination of Det. Poluikis, it introduced the footage of Defendant's recorded police interview and attempted to play it for the jury; however, there was apparently a problem with the audio and after several unsuccessful attempts to repair it, the trial court removed the jury from the courtroom, and following Fortezzo's accusation, asked a single juror to enter her chambers with both parties.

The trial judge stated, "It's been brought to my attention that you were speaking to the two jurors sitting next to you about your opinion about something that you observed on the video that was just played." She replied, "No. They were saying, 'you knew how to fix the sound right?' And I said, 'Well, yeah, that's what I do.' I'm an IT technician." The trial judge clarified, "So you all were talking

about fixing the sound?" The juror answered in the affirmative. The trial judge then asked Fortezzo what she had observed the juror say, and she indicated that Defendant had first brought it to her attention, then stated,

> So I did hear her say, "he's guilty," and then pointed at the video, and that is when I immediately stood up and came back here, because [Defendant] pointed directly to me and said, "they're still talking about the video." The words exactly that I heard was, "He is guilty."

The trial judge asked the juror if what Fortezzo stated was accurate, and the juror replied,

> No. Literally, they said, "you could fix the sound." I said, "Yeah. That's what I do." I said, "The HDMI port is not getting the audio, it's only getting the video." HDMI does audio and video. I said, "Tech 101; you could probably just power everything off and turn it back on to see if the signal will come through. If not, you'll just have to go in and manually reset the speaker from the computer itself to the actual television."

Neither party asked the juror any questions and the trial judge instructed her not to discuss their conversation with anyone. The trial judge then called the other two jurors into chambers one at a time and each of them confirmed the conversation as described.

Following the questioning of all involved parties, the trial court denied Defendant's motion for a mistrial based on the suspicion that the jurors were discussing Defendant's guilt, and also denied Defendant's motion for a mistrial based on his noted concern that the juror would harbor prejudice against Defendant due to Fortezzo's mistaken accusation.

The judge then interviewed the juror in chambers again, stating, "[M]y concern is that I don't want you to feel like you were accused of anything," and the juror replied, "I don't." The judge then asked whether the juror would hold any ill

34

will toward Defendant, and she responded, "I understand what's at stake, and it is what it is. I have no ill will towards [the] defense, [the] state, or whatever. That's it. I just wanted to fix the computer. That's it." After the judge confirmed the juror harbored no prejudice against Defendant, the juror stated further, "Like I said, I understand what's at stake. It's a life at stake. I understand that. No hard feelings at all."

Defendant relies on La. C.Cr.P. art. 775 which provides, in pertinent part: "Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771." However, the conduct which may have warranted a mistrial did not actually occur, because the jurors were not discussing Defendant's guilt in the case, and thus the trial court did not abuse its discretion in denying Defendant's motion for a mistrial on that issue.

Defendant's argument that the trial court should have nevertheless granted a mistrial based on the accusation levied at a juror by a member of his own defense team is likewise meritless. When questioned by the trial court, the juror assured the trial court she understood the gravity of the situation, and that she harbored no ill feelings toward Defendant or anyone else involved in the trial. The other two jurors involved were neither aware of any accusations, nor that Fortezzo had overheard their conversation. The trial court appeared satisfied that the juror was not prejudiced against Defendant, and Defendant has not shown that the trial court abused its discretion in so finding.

Defendant further claims that the trial court failed to cure the error by admonishing the jury. However, Defendant never requested that the trial court

admonish the jury. Further, the record does not indicate that the other jurors were aware of the accusation, and any admonishment would have only served to highlight the incident. Moreover, the only juror potentially affected was the juror who allegedly made the accusation of guilt and the trial judge privately admonished her, and confirmed that she harbored no prejudice toward Defendant as a result of the accusation.[24] Accordingly, we find that the trial court did not abuse its discretion in denying Defendant's motions for a mistrial. This assignment of error is meritless.

***Assignment of Error Number 5***

As his final assignment of error, Defendant argues that his sentences of forty years imprisonment at hard labor for his manslaughter conviction, and forty years at hard labor without the benefits of probation, parole, or suspension of sentence imposed on his conviction for armed robbery, are unconstitutionally excessive and "out of proportion to his participation in the crime." Defendant argues that in his view of the evidence presented at trial, Lafrance was the "mastermind" of the operation and intended to set Defendant up. Defendant asserts that Lafrance was the "actual shooter," and that "he got away with murder" and a short five-year sentence, which Defendant claims is unfair because Lafrance "was at least as culpable, if not more culpable," than Defendant.[25]

---

[24] Defendant also claims he was prejudiced by the interruption in his trial, and he should therefore be granted a new trial. However, it was Defendant's own conduct that resulted in the "interruption" in his trial, as he and his defense team initiated and pursued the incident. Even if Defendant's concerns were in good faith, a "[d]efendant should not be permitted to request that the trial court take specific actions, then request a mistrial based on the court's acquiescence to those requests." *State v. Gilliam*, 2021-0506, p. 22 (La. App. 4 Cir. 3/10/22), 336 So.3d 513, 529; *see also State v. Shank*, 448 So.2d 654, 657-59 (La. 1984) ("One charged with a crime cannot be permitted to subvert the ends of justice by his own intentional conduct").

[25] As noted earlier, Lafrance received a sentence of twenty years imprisonment at hard labor on the charge of obstruction of justice, and a concurrent sentence of five years on the charge of

A conviction for manslaughter carries a possible punishment of imprisonment at "hard labor for not more than forty years." La. R.S. 14:31(B). The possible sentence for a conviction for armed robbery is imprisonment at "hard labor for not less than ten years and for not more than ninety-nine years, without the benefit of probation, parole or suspension of sentence." La. R.S. 14:64(B). Thus, the trial court imposed the maximum possible sentence on the charge of manslaughter, and half of the possible sentence on the armed robbery charge.

"The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed." *State v. Bradley*, 2018-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100; *see also* La. C.Cr.P. art. 881.4(D). "[A] sentence is excessive and unconstitutional if it is grossly out of proportion to the severity of the crime or if it is nothing more than the purposeless and needless imposition of pain and suffering." *State v. Williams*, 2018-0445, p. 24 (La. App. 4 Cir. 2/27/19), 265 So.3d 902, 919–20 (quoting *State v. Bonanno*, 384 So.2d 355, 357 (La. 1980)). Thus, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. DeGruy*, 2020-0290, p. 9 (La. App. 4 Cir. 10/29/20) 307 So.3d 258, 265.

In the present case, while Defendant insists that Lafrance was the "actual" perpetrator, the trial court did not appear to share his view of the evidence. According to the Instagram and text messages sent by the victim, Lafrance, and Defendant, introduced at trial, Lafrance did not have any firearms to trade for the victim's rifle and had offered to buy it for $400 cash, but the victim declined.

---

accessory after the fact based on his full cooperation with the State and his testimony at Defendant's trial.

Lafrance brought Defendant into the transaction once he learned that Defendant had firearms he was willing to trade for the rifle. According to Lafrance's police interview, Defendant retained possession of his firearms throughout the incident, and no evidence was presented otherwise.

Using demonstrative evidence at trial during Det. Poluikis's testimony, the defense attempted to show that the trajectory of the bullet that entered the victim's head could have come from directly behind him, where Lafrance placed himself in the victim's vehicle. However, the State, using demonstrative props utilized in the testimony of Dr. Huber, showed that the bullet was more likely fired from Defendant's position as he was climbing over the victim to exit the vehicle, based on the victim's position sideways in the driver's seat. Additionally, Lafrance apparently had no previous arrest record, while Defendant had pled guilty to at least one other shooting, and the trial court noted during the sentencing hearing that defendant had "not expressed any sense of remorse in regards to this particular case."

For these reasons, Defendant's assertion that the evidence points to Lafrance as the "actual shooter," and the sole mastermind, is unconvincing. In any event, pursuant to La. R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, assistant and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Further, a principal "may be convicted of an offense even if he has not personally fired the fatal shot." *State v. Braneon*, 2019-0743, p. 8 (La. App. 4 Cir. 2/5/20) 289 So.3d 271, 278. "Principals are equally culpable for a crime, even if they do not personally commit the acts of the charged offense." *State v. Carter*, 2018-0072, p. 16 (La. App. 4 Cir. 10/10/18),

257 So.3d 776, 788. Similarly, under the law of principals, an accomplice can be found guilty of armed robbery without having personally taken anything or held a weapon. *See State v. Womack*, 47,639, pp. 9-10 (La. App. 2 Cir. 1/16/13), 109 So.3d 418, 424.

In this case, the trial court ordered a pre-sentencing investigation, and each party submitted a sentencing memorandum. Considering that defendant faced a mandatory life sentence if convicted of second degree murder, for which the state at least arguably presented sufficient evidence, the fact that the jury found him guilty of the responsive verdict of manslaughter represents a significant reduction in the maximum statutorily allowable punishment the trial court could impose. See *State v. Lewis*, 2009-1404, pp. 7-8 (La. 10/22/10), 48 So.3d 1073, 1077–78 ("In considering the nature of the offense, both the trial court and reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged[,]" while "accord[ing] paramount importance to the nature of the conduct proved at trial."); *see also State v. Wilson*, 2012-1765, pp. 25-26 (La. App. 4 Cir. 2/12/14) 138 So.3d 661, 678 ("Considering the allegations [the defendant] faced, he greatly benefitted from the jury finding him guilty of the lesser responsive verdict of simple robbery. Accordingly, it cannot be said that the maximum sentence of seven years at hard labor [was excessive]"); *State v. White*, 48,788, pp. 4-5 (La. App. 2 Cir. 2/26/14) 136 So.3d 280, 282 (Where the evidence presented at trial arguably supports a verdict of second degree murder, the sentencing court may take into consideration the great benefit derived from the jury's return of the lesser verdict of manslaughter).

Further, although the trial court decided to impose the maximum forty-year sentence for the manslaughter conviction, it declined to impose the maximum ninety-nine-year sentence on the armed robbery charge. In these circumstances, the sentences the trial court imposed are not out of proportion to the severity of the crimes for which Defendant was convicted and the trial court did not abuse its vast discretion in imposing Defendant's sentences.  As such, Defendant has not shown that he is entitled to relief on this claim.

## **CONCLUSION**

For the foregoing reasons, we affirm Defendant's convictions and sentences.


**CONVICTION AND SENTENCE AFFIRMED**